447 F.2d 323
 David GREEN, Individually and as Chairman of the Peace Committee of the Baltimore Meetings of the Religious Society of Friends, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,
National Broadcasting Company, Inc., Intervenor.
G. I. ASSOCIATION, Stephen P. Pizzo, individually and on behalf of the G. I. Association, et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,
American Broadcasting Companies, Inc., National Broadcasting Company, Inc., Intervenors.
 No. 24470.
 No. 24516.
 United States Court of Appeals, District of Columbia Circuit.
 Argued April 1, 1971.
 Decided June 18, 1971.
 
 Mr. Albert H. Kramer, Washington, D. C., for petitioner in No. 24,470.
 Mr. Donald A. Jelinek for petitioners in No. 24,516.
 Mr. Richard R. Zaragoza, Counsel, Federal Communications Commission, with whom Mr. John H. Conlin, Associate General Counsel, Federal Communications Commission, was on the brief, for respondents. Mr. Henry Geller, General Counsel at the time the record was filed, entered an appearance for respondent Federal Communications Commission. Mr. Howard E. Shapiro, Atty., Department of Justice, entered an appearance for respondent United States of America.
 Mr. Donald J. Mulvihill, Washington, D. C., with whom Messrs. Mathias E. Mone, Howard Monderer, Washington, D. C., and Roy L. Regozin were on the brief, for intervenor National Broadcasting Company, Inc.
 Messrs. James A. McKenna, Jr. and Vernon L. Wilkinson, Washington, D. C., entered appearances for intervenor American Broadcasting Companies, Inc. in No. 24,516.
 Before McGOWAN, ROBINSON and WILKEY, Circuit Judges.
 WILKEY, Circuit Judge:
 
 
 1
 Petitioners in both cases seek review and reversal of a ruling of the Federal Communications Commission that no violation of the agency's fairness doctrine occurred when stations in Washington, D. C., and San Francisco, California, refused to donate time to the petitioners for the purpose of broadcasting messages opposing military service or informing the public of alternatives to military service, after the stations had aired recruiting announcements in behalf of the Armed Services. We sustain the Commission's conclusion that the petitioners have not shown that the various licensees' exercise of judgment under the fairness doctrine was unreasonable, arbitrary, or in bad faith.
 
 I. Facts and Administrative Agency Action
 
 2
 The military recruitment announcements broadcast were appeals for voluntary enlistment in the various branches of the Armed Forces.[1] The recruitment announcements in themselves did not dwell upon the Vietnam war, or upon warfare in general, and only one of eighteen different announcements alluded to the draft.[2] Admittedly, they sought to present the attractive, positive, and advantageous side of military service.
 
 
 3
 Petitioner Green (No. 24,470), individually and as Chairman of the Peace Committee of the Baltimore Meeting of the Religious Society of Friends, wrote to television broadcasting stations in the Washington area to request "free air time to rebut the claim made by the numerous military recruitment advertisements presented on your station that a career in the armed forces is desirable, rewarding, and the best way to serve one's country." In response to some of the licensees' requests, petitioner Green submitted a proposed announcement as his presentation of a fair response to the issues he and the Committee asserted were raised by the military recruitment messages.[3] All three network TV stations in the Washington area declined to broadcast the proffered spot announcement, but all three offered an opportunity to petitioner Green and members of his group to appear on other programs discussing the question of the military draft as a controversial issue of public importance. The offers of two stations were rejected by petitioner Green and a complaint was filed with the FCC.
 
 
 4
 On behalf of petitioner G.I. Association and the other parties (No. 24,516), a letter was addressed to twenty-seven radio and television stations in the San Francisco area requesting an opportunity under the fairness doctrine to broadcast petitioners' views in opposition to the military recruitment announcements. The letter alleged that in none "of the recruitment advertisements on your station that have come to our attention (is it indicated) that an individual's participation in the armed services could lead to his involvement in the Vietnam war, * * *. Nor is it indicated in any of the recruitment advertisements that many deferments to military service are available under present laws and regulations." With the letter was enclosed a sample spot announcement entitled "Draft Counseling," setting forth petitioners' view on the alleged controversial issue.[4] Those broadcast stations which were solicited denied the request, after which complaint was made to the FCC.
 
 
 5
 By letters ruling simultaneously on the two requests, the Federal Communications Commission decided that the broadcast stations did not act unreasonably in refusing the petitioners' requests, declined to disturb the judgment of each television and radio licensee, and determined that no further action was warranted at that time. The Commission considered that the crucial question was "whether Armed Forces recruitment messages constitute the presentation of one side of a controversial issue of public importance" and concluded that they did not.[5] The Commission noted that the petitioners themselves seemed to view the recruitment messages as controversial because they were inextricably involved with the Vietnam war and the draft, one strong indication of that being that the proposed spot announcements submitted both in Washington and San Francisco dealt in unmistakable terms with the draft and the Vietnam war, not with the merits of voluntary enlistment alone. On the issues of the Vietnam war and the draft the Commission concluded that all television and radio stations which had been requested to broadcast petitioners' spot announcements were giving a full coverage to these issues; indeed this was not controverted.
 
 
 6
 II. Federal Communications Commission Standards for the Fairness Doctrine
 
 
 7
 To invoke the fairness doctrine all parties recognize that there must exist a "controversial issue of public importance" on which the licensee has refused to allow the presentation of a reasonably balanced point of view. Petitioner in No. 24,470 urges that the difference of opinion as to what issues were raised by the recruitment announcements was caused by the FCC's failure to promulgate adequate standards to guide broadcasters in determining their obligations under the fairness doctrine, and he seeks not only a reversal of the Commission's ruling in this case but also a declaration from us that the Commission's fairness standards are inadequate. Petitioner Green argues that the FCC's rule of deferring to "reasonable" fairness doctrine determinations by a licensee violates the public interest standard of the Communications Act, and the First and Fifth Amendments because this rule is too vague and imposes a prior restraint on expression. He asserts that the FCC should be required to promulgate specific standards to determine (1) what is the issue, (2) whether the issue is controversial, and (3) whether the licensee has presented a balanced coverage.
 
 
 8
 At the outset we note that the fairness doctrine was most recently elaborated by the FCC[6] in response to the Supreme Court's decision in Red Lion Broadcasting Co., Inc., v. FCC.[7] The Supreme Court itself enunciated two bases for the fairness doctrine: First, the statutory basis, that broadcast facilities must operate in the public interest; second, that under the First Amendment the public has a right to free and open debate. The Commission's rule provides that if one position on a controversial issue of public importance is broadcast twice within a period of six to nine months, or if the licensee itself editorializes on the air, the licensee has an affirmative duty to seek a spokesman for the other point of view. As to how the conflicting points of view are presented, a licensee can present conflicting views in any fashion, so long as the balance in format, time, protagonists, etc., meets a test of "reasonableness."[8] In addition to achieving a balance in presentation of conflicting views, this rule purports to foster self-regulation, to avoid any implication of censorship by the Commission, and to enable the broadcasters themselves to safeguard their economic interests in allocation of time.
 
 
 9
 The fairness doctrine is not to be confused with the doctrine of "equal time" which directs in firm statutory language (§ 315) that licensees treat equally all legally qualified candidates for public office;[9] under the fairness doctrine identical treatment of both sides of the issue is not necessary, as this would place an onerous and impractical burden on the licensees. A further difference, no individual member of the public has the right of access to the air; the licensees may exercise their judgment as to what material is presented and by whom. While we observe that the three network licensees in the Washington area all invited petitioner Green to appear in one program format or another, clearly under the FCC fairness doctrine the licensees were not obligated to have any particular advocate appear at all. The fairness doctrine is issue-oriented, and it would be sufficient if each licensee could show that the point of view advocated by petitioner Green had been or was being presented on its station by others.
 
 
 10
 In our view, the essential basis for any fairness doctrine, no matter with what specificity the standards are defined, is that the American public must not be left uninformed. On the record in this case, no matter how the issue is taken, we cannot conceive that any live American has been left uninformed about the desirability or undesirability of military service, the draft, or the Vietnam war. We do not see that the participation of either petitioner Green and his group, or the G.I. Association and the other petitioners, under any doctrine of fairness, would be necessary to an informed public.
 
 
 11
 To the extent that the FCC enunciation of the fairness doctrine may lack the precision of standards which petitioner Green believes necessary, it is sufficient answer to point out that at no time did petitioners urge upon the Commission a different standard than that already promulgated by the FCC. Under § 405 of the Communications Act this would seem to be a classic case for seeking reconsideration by the Commission before coming here for judicial review of the Commission's Action.[10] If the Commission standards for the fairness doctrine are deficient (we by no means infer that they are), surely the Commission itself deserves the first opportunity to improve those standards, and in so doing it should have the benefit of whatever assistance petitioner Green and his group can give. A proffer of such to the Commission was not made in this case. Therefore, we do not think it appropriate to review here the adequacy of the standards of the fairness doctrine as already enunciated by the FCC.
 
 
 12
 III. The Issues and the Fairness Doctrine Applied Thereto
 
 
 13
 To invoke the fairness doctrine as a ground for obtaining access to the air waves, it is not only necessary to define a controversial issue of public importance, but implicitly it is first necessary to define the issue. Intermixed in the exchange of letters and legal papers among the parties, and in argument before this court, there appear to be five different issues around which the petitioners and other parties have circled, trying to define "the issue," each in his own light: (1) military manpower recruitment by voluntary means, (2) the draft, (3) the Vietnam war, (4) the morality of participation in any war, and (5) the "desirability" of military service.
 
 
 14
 1. Military manpower recruitment by voluntary means.
 
 
 15
 We consider that the first issue, military manpower recruitment by voluntary means, is all that was implicit in virtually all the Armed Services recruitment announcements. If this is the issue raised, is it a "controversial issue of public importance"? To oppose all enlistment, even voluntary, would be in effect to urge the abolition of United States military forces. As the Commission stated, "We note that the power of the Government to raise an army has not been questioned." Nor do petitioners contend that the concept of unilaterally abolishing all United States military forces at the present time is "a controversial issue of public importance" demanding allocation of broadcast time. Indeed, in their briefs and at oral argument, the petitioners seemed to shy away from so defining the issue.
 
 
 16
 Hence, the licensees concluded that voluntary military recruitment in itself was not controversial and was not any issue of public importance. The FCC decided that it was not unreasonable for the licensees to so conclude in regard to the Armed Services military recruitment announcements. On review here, we sustain this finding of the Commission that the licensees made a good faith, reasonable judgment on this question, which is all that is required under the fairness doctrine.
 
 
 17
 2 and 3. The draft and the Vietnam war.
 
 
 18
 The petitioners did not treat the military recruitment announcements as being of such limited import, but rather treated the issue involved here as being (2) the draft and (3) the Vietnam war. It is readily apparent that both groups of petitioners in Washington and in San Francisco, when they came to submit their proposed replies to the Armed Forces recruitment announcements, immediately enmeshed themselves in opposition to the draft and the Vietnam war.[11] Analysis of the spot announcements proposed by both petitioners as rebuttals to the military recruitment announcements shows that in each case there was an anti-Vietnam and an anti-draft pitch. For example, petitioner Green's submitted announcement referred to "every draftee," "legal alternatives to military service," "deferments." One who voluntarily enlists, which is the object of the recruitment announcements, is not a draftee. Legal alternatives to military service only have reference to the draft, there is no problem of legal alternatives to voluntary enlistment. Nor is there any such thing as a deferment from voluntary enlistment.
 
 
 19
 The proposed radio spot of petitioner G.I. Association was entitled "Draft Counseling," and discussed the draft and possible deferment exclusively. The sample television spot focused on a young man standing in front of a row of gravestones, and his first words were to be, "It was my experience as a captain in Vietnam." The second young man, likewise silhouetted against a large cemetery, was to start off, "I was an enlisted man in Vietnam," and referred to "the problems of what is basically a civil war." The announcer was to refer to "a war that doesn't make sense," and to "military deferment."
 
 
 20
 This was the basic content and theme which the petitioners wished to get across to the American public. This action of the petitioners themselves placed a broader interpretation on the military recruitment announcements than either the stations, the FCC, or we feel is justified.
 
 
 21
 But taking the issue as thus broadened by the petitioners themselves, in neither case is there any allegation that there is no adequate coverage of these issues by the licensees at the present time.[12] It is not only apparent that the draft issue and the Vietnam war issue are issues of overwhelming importance, but also equally undeniable that these issues have been ventilated in extenso for years on (probably) every television and radio station in the land. If the draft and Vietnam are properly the issues raised, and petitioners' own submitted announcements seem to indicate they are, then there can be no complaint under the fairness doctrine that these licensees and others have not given full and adequate coverage to these issues. And, as a matter of record, the particular broadcast stations here involved did offer the petitioners and the groups they represent an opportunity to participate in programs dealing with these broader issues. Petitioner Green and his group accepted the offer of one TV station in Washington; they chose to reject the offers of the other two TV stations as not being responsive to their request.
 
 
 22
 4. The morality of participating in any war.
 
 
 23
 In regard to the even broader issue, (4) the moral question of participation in any war, this too is an issue which we believe has been aired on many television stations (the record is not clear as to these particular licensees), and would have been at least peripherally involved in the programs offered by these licensees to the petitioners here. But petitioners in their briefs have not claimed that this is properly the issue raised, and in oral argument seemed to abjure any such philosophical question.
 
 
 24
 5. The desirability of military service.
 
 
 25
 By the time of oral argument both groups of petitioners preferred to define the issue as whether military service was "desirable, rewarding, or the best way to serve one's country," according to petitioner Green, and simply as whether military service was "desirable," according to the petitioner G.I. Association. Yet even taking this as the defined issue, it is obvious that desirability or undesirability of military service comes right back to the draft and the Vietnam war. These features of desirability are exactly what both petitioners dramatized in their proposed spot announcements (see footnotes 3 and 4). And as we have made clear, and as no one contends otherwise, as issues the draft and the Vietnam war have been covered in multiple facets.
 
 
 26
 Considering the argument as phrased in terms of desirability, although generally agreeing in thus defining the issue, the two groups of petitioners took a different view on the way in which the fairness doctrine should be applied and the fact situation as to broadcast coverage. In response to a direct question by the court, petitioner Green flatly said that to his knowledge there was nothing now being shown on television which demonstrated that military service is undesirable.[13] On known facts of common experience, we think this position verges on the incredible. Unless casual viewing over the past seven years has been totally unrepresentative, it is our opinion that the undesirable features of military life have been displayed in virtually every living room in the country, frequently in full living (or dying) color, in the American television networks' endeavor to bring the Vietnam war and all of its miseries home to the American people. To say that these national network television stations have not given adequate and complete coverage to the undesirable features of military life in our age, to ignore the past six years' television coverage of the American military effort in Southeast Asia, not to mention the weekly casualty figures routinely broadcast by the networks, and therefore to maintain that under the fairness doctrine the spot announcements or something similar thereto and the personal message of these petitioners on the airways is necessary to counteract the otherwise prevailing propaganda of the military forces that military service is exclusively desirable and good for you, is beyond our acceptance.[14]
 
 
 27
 Petitioner G.I. Association took a different approach. Its counsel, in response to the same or similar question, admitted that the American public was not unaware of the undesirable features of military service, but argued that prior to the military recruitment announcements there was somewhat of a balance presented to the public as to the desirable and undesirable features, and that the addition of the military recruitment announcements to television time had thus upset the balance in favor of these "highly effective spot announcements." We will not attempt to assay here what balance or lack of balance there has existed and does exist in a presentation of the desirable and undesirable features of military life; it is sufficient to point out that under the fairness doctrine it is not necessary that there be an absolute equality of either time, time of viewing, or dramatic impact, or absolute equality in any other criteria for the points of view presented under the fairness doctrine. What the petitioners are apparently confusing with the fairness doctrine is the doctrine of equal time, which has no relevance whatsoever to the issues in this case. Unlike the "equal opportunities" requirement, which as we have already pointed out deals with legally qualified candidates for public office, the question under the fairness doctrine is one of reasonableness of the station's action, and not whether absolute equality in allocation of time, time of day, or any other criteria, has been achieved.
 
 
 28
 IV. Inapplicability of the Banzhaf Decision Here
 
 
 29
 Petitioners in No. 24,516 have taken the position, both before the Commission and now before this court, that their complaint is controlled by, and is indistinguishable from the Commission's landmark cigarette advertising ruling.[15] Applicability of Fairness Doctrine to Cigarette Advertising, 9 F.C.C.2d 921 (1967), aff'd sub nom. Banzhaf v. FCC, 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968), cert. denied sub nom. Tobacco Institute v. FCC, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969). Since the Commission found that the several issues — both explicit and implicit — surrounding military recruitment advertising were either not controversial matters of public importance (i. e., whether the United States should maintain an armed force) or were adequately covered by the various licensees (the draft and Vietnam), no discussion of the scope of its "cigarette case" was required. Likewise, the General Counsel for the FCC in his brief in this court, reasoning that "the determination of whether to extend the cigarette ruling to the broadcast of military recruitment announcements is a policy judgment to be made initially by the Commission," did not address himself to the merits of petitioners' contentions on this issue.
 
 
 30
 Our disposition of petitioners' complaint, compatibly with the agency's ruling, renders extended evaluation of the similarities and dissimilarities between this case and Banzhaf, strictly speaking, unnecessary. However, petitioners' dogged reliance on that case, as well as Commissioner Johnson's lengthy dissenting discussion, compels us to interject a word of explanation regarding the matter of analogy to the cigarette litigation. Petitioners claim that Banzhaf sweepingly holds that "when one side of a controversial issue is presented in the form of frequent spot announcements, the other side must be allowed to present its views in a similar fashion." We would have thought that the opinions of court and Commission would have made unmistakably clear that it is not every advertisement carrying a controversial message which calls for response through a similar spot announcement format.[16] The emphasis, quite to the contrary, was on the uniquely serious and well-documented hazards to the public health inherent in cigarette smoking — hazards deeply explored and extensively expounded upon by the other branches of government — which stood at the core of the Banzhaf ruling.
 
 
 31
 Nor can we accept the dissenting Commissioner's view. He argues that because of the possibilities of grave physical injury and death associated with service in Vietnam, military recruitment ads raise issues equally as significantly related to the general public health as do cigarette commercials and therefore require similar treatment under the fairness doctrine. Such reasoning overlooks, we think, the crucial point that the fairness doctrine's goal is the "promotion of informed decision-making by the public."[17] "It is the right of the public to receive suitable access to * * * ideas and experiences which is crucial here,"[18] rather than the desire of those who espouse competing views to express their opinions no matter how fully the same subject matter is covered in the licensee's programming or is patently apparent to the public.
 
 
 32
 Other cases presently pending or yet to be brought before this court will provide the appropriate occasions for critically tracing the contours of the public interest standard as it applies to commercial advertising.[19] It is sufficient for the resolution of all contentions raised in the proceedings immediately before us to recognize that, whatever the logical sweep of the existing ruling as to cigarettes, these arguments reach far beyond the contemplation of either the court's or the Commission's ruling that a fair response to cigarette advertising in the name of the general public health was in the public interest.
 
 
 33
 For the reasons stated, we decline to reverse the ruling of the Federal Communications Commission rejecting the complaint by both groups of petitioners under the fairness doctrine.
 
 
 
 Notes:
 
 
 [1]
 Two typical examples are:
 SPOT NUMBER ONE
 Are you a young man who likes a challenge and who likes to do his best at anything he does? Well, if you are * * * the United States Army needs you. Life in the Army demands the very best you have * * * and in return the Army offers you educational opportunities * * * travel * * * good pay * * * and most important * * * the opportunity to make a really worthwhile contribution to the security of your country. For all the facts * * * visit your local Army recruiter. Your future * * * your decision * * * choose Army.
 SPOT NUMBER SEVENTEEN
 Ask a marine officer what it means to be a marine lieutenant. Ask him what it takes to lead a marine platoon. He'll tell you it's about the toughest post-graduate course a college man ever had. He'll tell you it takes every ounce of leadership you've got, because a fighting man just doesn't come any finer than a marine. And if you can lead a platoon of marines, you can lead anybody. Anywhere, anytime. Refrain: Ask a marine.
 
 
 [2]
 The text of the one spot announcement alluding to the draft reads:
 This is Frank Blair speaking to young men facing a military obligation. As a father, I was pleased when my sons Thomas and John told me they wanted to become Marines. They told me that there was more than one way to look at an obligation: to consider it something you have to do, or as an opportunity to grow as an individual. How about you? Are you ready to develop in body, mind and spirit? Find out the details from your Marine Corps representative today.
 
 
 [3]
 The text of petitioner's announcement is as follows: "* * * Christina spends her time trying to forget, but can't. For every draftee that goes off to war there is a Christina left behind — sometimes for good. * * * There are legal alternatives to military service. You may be entitled to one of a number of deferrments [sic] provided by law. For information write to this address. * * *"
 
 
 [4]
 The text of petitioners' sample radio announcement was as follows:
 
 Draft Counseling
 
 Attention all men of draft age. What are you planning to do about the draft? It is not generally known, but the selective service law does provide many deferments to which you may be entitled. If the army is not your bag, and you feel you may be eligible for a deferment — do something about it now. Phone 642-1431 for free information. Draft counselors and attorneys are available throughout the Bay Area. That phone number again is 642-1431.
 Petitioners also included in Appendix V of their complaint to the FCC additional sample spot announcements, but that appendix does not appear to have been included in the record on appeal. The texts of these spot announcements, however, were included in the brief filed by NBC and, no exception having been taken by any party to their accuracy, we quote them as follows:
 
 60-Second Proposed Radio Spot
 
 Annr: Thinking about joining the Army? Before you do, consider the facts. Chances are, the only job you'll learn is how to kill. Chances are, you'll wind up in Vietnam, killing and perhaps getting killed, in a war that doesn't make much sense. So if you're thinking about the military, remember this: You may be eligible for a military deferment. * * *
 
 Proposed Television Spot
 
 Opening shot of a young man standing in front of a row of gravestones in the Presidio of San Francisco.
 Young man: It was my experience as a captain in Vietnam. * * *
 Camera shifts to a second young man, kneeling in front of a single gravestone. As he speaks, the camera backs away to catch sight of more and more and finally hundreds of graves.
 Second young man: I was an enlisted man in Vietnam. * * *
 Announcer: Chances are the Army will teach you how to kill, Chances are you'll wind up in Vietnam and perhaps get killed in a war that doesn't make sense. Remember this: You may be eligible for military deferment. For free information call 642-1431. * * *
 
 
 [5]
 In the letter to the G.I. Association representative the Commission concluded:
 In the present case, we do not believe that the broadcast of Armed Forces recruitment messages * * * raises a controversial issue of public importance requiring presentation of conflicting viewpoints. We note that the power of the Government to raise an army has not been questioned; rather the thrust of the complaint is an objection to the use made of the army (war in Vietnam) and the manner in which manpower is conscripted (Selective Service draft).
 In reaching this conclusion we also note that complainants themselves reason that recruitment messages are controversial because they are inextricably intertwined with the conduct of the war in Vietnam and the Selective Service draft. There is no indication that any of the stations against whom the complaint was filed have failed to treat the issues of Vietnam and the draft (both concededly controversial issues of public importance) in conformance with the fairness doctrine. Moreover, the only indication as to what complainants consider the "opposing viewpoint" to the Armed Forces recruitment announcements is one spot announcement entitled "Draft Counseling," which offers information pertaining to draft deferments. The fact that Vietnam and the draft are controversial issues of public importance does not, in our view, automatically require that recruitment messages also be considered as such, and we are unable to conclude that it was unreasonable for the broadcast stations in the San Francisco area to decline to broadcast the "opposing" spot announcements.
 Similarly, to the representative of the Friends Peace Committee the Commission said:
 [W]e note that the announcements which the Friends Peace Committee seeks to have broadcast does [sic] not deal with the issue of whether there should be armed forces, but rather focuses on the draft. * * * Absent evidence that stations WMAL and WRC have failed in their overall programming to achieve fairness in their coverage of the controversial issue here involved (i. e., the draft), the Commission will not disturb the licensees' determination as to how to best inform the public of the various facets of issues of controversial public importance.
 
 
 [6]
 In re Obligations of Broadcast Licensees Under the Fairness Doctrine, 23 F.C.C. 2d 27, 28 (1970)
 The fairness doctrine was evolved as a policy under the public interest standard in a series of cases, given its definitive policy statement in the Commission's 1949 Editorializing Report (13 F.C.C. 1246), and codified into the Communications Act in 1959. See section 315(a) 47 U.S.C. § 315(a); Red Lion Broadcasting Company, Inc. v. Federal Communications Commission, supra. It requires the broadcast licensee to afford reasonable opportunity for the discussion of conflicting viewpoints on controversial issues of public importance. The Commission early determined that if the fairness doctrine were to achieve its most salutary purpose, an affirmative obligation in this respect must be imposed upon the licensee. * * *
 The Commission's general approach to this facet of the fairness doctrine is set forth in a 1964 ruling, Letter to Mid-Florida Television Corporation, 40 F.C.C. 620, 621 (1964):
 * * * The Commission does not seek to establish a rigid formula for compliance with the fairness doctrine. The mechanics of achieving fairness will necessarily vary with the circumstances, and it is within the discretion of each licensee, acting in good faith, to choose an appropriate method of implementing the policy to aid and encourage expression of contrasting viewpoints. Our experience indicates that licensees have chosen a variety of methods, and often combinations of various methods. * * *
 
 
 [7]
 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed. 2d 371 (1969)
 
 
 [8]
 The Commission has said:
 The fairness doctrine deals with the broader question of affording reasonable opportunity for the presentation of contrasting viewpoints on controversial issues of public importance. Generally speaking, it does not apply with the precision of the "equal opportunities" requirement. Rather, the licensee, in applying the fairness doctrine, is called upon to make reasonable judgments in good faith on the facts of each situation — as to whether a controversial issue of public importance is involved, as to what viewpoints have been or should be presented, as to the format and spokesmen to present the viewpoints, and all the other facets of such programming. See par. 9, Editorializing Report. In passing on any complaint in this area, the Commission's role is not to substitute its judgment for that of the licensee as to any of the above programming decisions, but rather to determine whether the licensee can be said to have acted reasonably and in good faith. There is thus room for considerably more discretion on the part of the licensee under the fairness doctrine than under the "equal opportunities" requirement.
 In re Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 40 F.C.C. 598, 599 (1964).
 
 
 [9]
 Section 315 reads in pertinent part:
 § 315. Candidates for public office; facilities; rules
 (a) If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station. * * * Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.
 The FCC commented:
 While Section 315 thus embodies both the "equal opportunities" requirement and the fairness doctrine, they apply to different situations and in different ways. The "equal opportunities" requirement relates solely to use of broadcast facilities by candidates for public office. With certain exceptions involving specified news-type programs, the law provides that if a licensee permits a person who is a legally qualified candidate for public office to use a broadcast station, he shall afford equal opportunities to all other such candidates for that office in the use of the station.
 In re Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 40 F.C.C. 598, 599 (1964).
 
 
 [10]
 Section 405 provides in pertinent part:
 The filing of a petition for rehearing shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review * * * (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass.
 
 
 [11]
 See footnotes 3 and 4, supra.
 
 
 [12]
 In both cases in identical language the Commission found: "There is no indication that any of the stations against whom the complaint was filed have failed to treat the issues of Vietnam and the draft (both concededly controversial issues of public importance) in conformance with the fairness doctrine."
 
 
 [13]
 At oral argument there occurred the following colloquy between the court and petitioner Green's counsel:
 Q.: Is there anything on TV that supports your point of view that military service is undesirable?
 COUNSEL: Not to my knowledge.
 Q.: On television?
 COUNSEL: Not to my knowledge.
 Q.: There's nothing on television that you've seen in the last year or five years that indicates to young men that military service is not desirable?
 COUNSEL: Not to my knowledge.
 Q.: Thank you.
 
 
 [14]
 We do not suggest that a licensee charged with violation of the fairness doctrine may seek absolution by reference to compliance with it by other licensees. In each of the cases before us, however, the licensees complained of were expressly identified, and it was not alleged that any one of them was failing to discharge its public service obligation in respect of Viet Nam and the draftSee footnote 12, supra.
 
 
 [15]
 Petitioners in No. 24,470, on the other hand, have persistently eschewed any reliance onBanzhaf and have instead contended that their complaint may be resolved according to conventional fairness doctrine standards. Indeed, they have not insisted on spot announcements but have indicated their readiness to accept any "forum adequate to balance the views already presented by the licensees."
 
 
 [16]
 Nor may Retail Store Employees Union v. FCC, 141 U.S.App.D.C. 94, 436 F.2d 248 (1970) be relied on as support for so broad an interpretation ofBanzhaf. The fairness doctrine issue arose there in the context of a license renewal proceeding in which a labor union challenged the licensee's refusal to air announcements urging listeners to boycott a department store. The management of the store, with whom the union was locked in a protracted labor dispute, had been regularly presenting advertisements requesting the public to patronize its store. In remanding the case, the court instructed the Commission to take into account, as an aspect of the "public interest," the congressional policy "favoring the equalization of economic bargaining power between workers and their employers." Id. at 259. Nowhere in the court's discussion of the applicable statutory standard (Id. at 256-259) can be found any indication that the broad discretion generally accorded to licensees in meeting their obligation to present opposing views on controversial issues has been replaced by a rule requiring response in kind in all commercial advertising cases.
 
 
 [17]
 Retail Store Employees Union v. FCC,supra at 257.
 
 
 [18]
 Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 390, 89 S.Ct. 1794, 1807, 23 L.Ed.2d 371 (1969)
 
 
 [19]
 The case which the FCC recognizes as the most direct challenge to its cigarette ruling to date — the air pollution issues raised by automobile and gasoline advertising in New York City — is presently pending before this court. Friends of the Earth v. FCC, No. 24,556 (argued 10 June 1971). For the Commission's ruling in this case see 24 F.C.C.2d 743 (1970)
 We also note the Commission's recent announcement that it is preparing to institute proceedings "to consider every facet of the Fairness Doctrine and related public interest policies." FCC News Release, Report No. 9876, at 3 (14 May 1971). Such an investigation at the agency level should provide a helpful and much-needed illumination of the commercial advertising aspects of the fairness doctrine.