**DEMOCRATIC NATIONAL COMMIT-TEE, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COM-MISSION**

and

**United States of America, Respondents,**

**American Broadcasting Companies, Inc., et al., Intervenors.**

No. 72-1314.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 12, 1972.

Decided June 29, 1973.

---

544

——◆——

Charles H. Wilson, Jr., Washington, D. C., with whom Joseph A. Califano, Jr., Washington, D. C., was on the brief for petitioner.

Jon H. Marple, Counsel, F. C. C., with whom John W. Pettit, Gen. Counsel, Joseph A. Marino, Associate Gen. Counsel, and Charles A. Zielinski, Counsel, F. C. C., were on the brief, for respondents.

Timothy B. Dyk, Washington, D. C., with whom J. Roger Wollenberg, Daniel Marcus and Stephen F. Black, Washington, D. C., were on the brief, for intervenor, Columbia Broadcasting System, Inc.

Lawrence J. McKay, New York City, Donald J. Mulvihill, Laurence T. Sorkin and Raymond A. Messina, Washington, D. C., were on the brief, for intervenor, National Broadcasting Co., Inc.

James A. McKenna, Jr., and Carl R. Ramey, Washington, D. C., entered appearances for intervenor, American Broadcasting Cos., Inc.

Before WINTER,* Circuit Judge for the Fourth Circuit, and MacKINNON and ROBB, Circuit Judges.

MacKINNON, Circuit Judge:

Once again we are confronted with the issue on appeal of whether the FCC has properly applied its fairness doctrine to a particular set of facts. The petitioner, the Democratic National Committee (hereinafter DNC), contends that the Commission erred in determining that the three major television networks had acted reasonably in pursuing their obligation to provide adequate coverage of public issues in their refusal in August–October 1971 to make available free prime-time television air to DNC to respond to certain Presidential addresses concerning the Administration's economic policy.

The Presidential broadcasts at issue consisted of the following appearances on all three networks:

(1) An address on August 15, 1971, announcing the Administration's new economic program, broadcast by the networks live on television and radio between 9:00 p. m. and 9:20 p. m., EDT.

(2) A Labor Day address on September 6, 1971, clarifying the new program, broadcast by the networks

* Sitting by designation pursuant to 28 U.S.C. § 201(a).

live on radio only between 12:00 noon and 12:15 p. m., EDT.

(3) An address delivered on September 9, 1971, at the request of the Democratic congressional leadership to a joint session of Congress explaining the President's new economic policy and outlining legislation designed by the Administration to help achieve the policy's goals. The networks broadcast this speech live on television and radio during non-prime time from 12:30 p. m. to 1:08 p. m., EDT.

(4) An address on October 7, 1971, announcing Phase II of the new economic program, broadcast live by the networks on television and radio between 7:30 p. m. and 7:46 p. m., EDT. Petitioner also argues that three non-prime-time press conferences with then Treasury Secretary John Connally dealing with the President's economic program should be weighed along with the President's personal addresses.[1]

DNC sought permission from the networks to respond to some of these broadcasts, and, upon being refused, filed a complaint with the Commission seeking an order to compel NBC, CBS and ABC to provide free time for the presentation of its viewpoint on the national economy. In its arguments to the Commission, DNC again pressed its contention [2] that Presidential addresses should give rise to an *automatic right of reply* by spokesmen of the opposing party—a position emphatically rejected by us in Democratic National Committee v. F. C. C., 148 U.S.App.D.C. 383, 460 F.2d 891, cert. denied 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972). In addition, DNC argued that under the Commission's decision in Committee for the Fair Broadcasting of Controversial Issues, 25 F.C.C.2d 283 (1970) (hereinafter *Fair Committee*) these facts must give rise to a right of reply. In *Fair Committee* the Commission held that five uninterrupted prime-time television (and radio) Presidential addresses dealing with the Indochina war in a seven month period where coverage had otherwise been roughly in balance, presented a unique situation requiring the networks to provide an opportunity for some spokesman for the other side to respond with one uninterrupted prime-time appearance. In opposing these contentions, each of the three networks responded to DNC's complaint by pointing out the factual distinction between this case and *Fair Committee* and describing a comprehensive coverage of the viewpoints of critics of the President's economic program that had already been implemented by them.[3] These facts relating to network programming of op-

---

1. Secretary Connally's press conferences were broadcast by the three television and radio networks as follows: August 16, 12 noon to 1 p. m.; October 8, 1 p. m. to 2 p. m.; November 22, 11:30 a. m. to 12:10 p. m.

   The Commission declined to equate the Connally conferences with the President's addresses and we agree. *See infra* at 548.

2. DNC had recently argued this approach to the Commission and had it rejected—a decision we ultimately affirmed in Democratic National Committee v. F.C. C., 148 U.S.App.D.C. 383, 460 F.2d 891, cert. denied 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972). Since the argument had recently been rejected by the Commission, the DNC only briefly summarized it again in its letter of complaint in this case. J.A. 5.

3. ABC stated that after the August 15, 1971 Presidential appearance, it presented contrasting points of view in the ABC network evening and weekend news programs, and in public affairs programs. (J.A. 45). Among the leading spokesmen who expressed views critical of the President's economic policies on these programs were Senators McGovern, Humphrey, Mansfield, Muskie, and Proxmire, Representatives Mills and Patman, Governor Smith of Texas, AFL–CIO President Meany, and UAW President Woodcock. (J.A. 45). Among the ABC programming on the economy issue was a special half-hour presentation, "The Economy: A Continuing Report," broadcast on October 13 from 7:30 to 8:00 p. m. It included the views of prominent Democrats—Senators Humphrey and Proxmire and Dr. Arthur Okun, former Chairman of the Council of Economic Advisers under President Johnson. Many aspects of the Administration's

posing viewpoints were uncontested by DNC. The Commission requested the transcripts of four of these opposing broadcasts (two from CBS, one from NBC and one from ABC) and these were duly submitted for the Commission's study over the objections of DNC.

On February 17, 1972, the Commission denied DNC's complaint. J.A. 200–11. The Commission held that there was no showing that the networks had failed to meet their fairness doctrine obligation to present contrasting views on the President's economic program. Following its earlier rulings, the Commission reaffirmed that there is no automatic right of reply to Presidential broadcast appearances. J.A. 208–09. While recognizing that in *Fair Committee* it had required the networks to af-

ford additional time to respond to the President on the special facts of that case, the Commission noted that the present case was readily distinguishable from its earlier ruling and that, in light of the policies of the fairness doctrine and the Communications Act, the factual differences between the cases justified different results. J.A. 206–11. Finally, the Commission ruled that even if DNC's complaint were substantively meritorious, DNC would not be entitled to an order requiring the networks to afford DNC time to respond to the President, since the fairness doctrine left the selection of appropriate spokesmen to the licensee's discretion. J.A. 205–06. The Commission found the inappropriateness of the relief requested to be an independent ground for its decision. J. A. 206.[4]

---

economic policy were discussed in this program. (J.A. 46).

CBS pointed out that contrasting views were included in its regular news coverage and that special programs and reports were aired which featured contrasting views by labor union leaders, including UAW President Woodcock, and other opposition spokesmen. On August 16, 1971, from 10:00 p. m. to 11:00 p. m., CBS presented the program "The Economy: A New Way to Go," which constituted a broad ranging discussion of the issues raised by the Administration's economic policy. And, on October 8, 1971 CBS presented the news special, "After the Freeze," which included extensive criticism of the Administration's wage and price freeze policy. In addition, between August 22 and September 26, 1971, the CBS program *Face the Nation* included interviews with Governor Preston Smith of Texas, Senator William Proxmire, and Senator Hubert Humphrey who each expressed views critical of various aspects of the Administration's economic policy. (J.A. 51–52). CBS further pointed out that approximately 53 minutes of regularly scheduled television news programs during the one-month period following the President's August 15th address were devoted to contrasting views on national economic issues. In addition, CBS aired part of a press conference by President George Meany of the AFL–CIO and an address by Mr. I. W. Abel, President of the United Steel Workers of America,

both of whom strongly criticized the Administration's program. (J.A. 51).

NBC also indicated that views in contrast to the President's had been aired in regularly scheduled news, discussion and interview programs. In addition to submitting a lengthy list of items dealing with coverage of economic issues in NBC's nightly news programs (*See* J.A. 56–60), NBC indicated that it had presented a number of interviews and special programs on economic issues. These included appearances by UAW President Woodcock, Senator Fred Harris and Dr. Walter Heller (a leading Government economist during the Johnson Administration) who expressed contrasting views on the economy on individual *Meet the Press* programs during the period in question. In addition, leading Democrats, Ohio Governor Gilligan, Representative Mills and Senator Humphrey appeared on NBC's *Today* program to express their opposing views on various facets of the Administration's economic policy. (J.A. 56–58).

4. In its decision in this case the Commission noted that it was concurrently engaged in considering the efficacy of the fairness doctrine in the context of a broad rule-making proceeding. J.A. 205. On June 16, 1972, the Commission issued its *First Report* in that proceeding in which it strongly reaffirmed its view that, while presidential appearances are subject to the fairness doctrine, there are no equal-opportunities rights of reply to such appearances. Handling of Public Issues

██ The fairness doctrine has been discussed at great length by the courts in recent years and it is unnecessary to examine its fundamental principles in detail here. Suffice it to say that the doctrine places a duty on the licensee to "give adequate coverage to public issues . . . and coverage must be fair in that it accurately reflects opposing views." Red Lion Broadcasting Co. v. F. C. C., 395 U.S. 367, 377–378, 89 S.Ct. 1794, 1800, 23 L.Ed.2d 371 (1969). We have repeatedly emphasized the importance of the discretion of the licensee in achieving this goal.

By its very nature the fairness doctrine is one which cannot be applied with scientific and mathematical certainty. There is no formula which if followed will assure that the requirements of the doctrine have been met. Procedurally, the doctrine can only succeed when the licensee exercises that discretion upon which he is instructed to call upon in dealing with coverage of controversial issues.

Democratic National Committee v. F. C. C., *supra*, 148 U.S.App.D.C. at 392, 460 F.2d at 900. Recently the Supreme Court has again reaffirmed its faith in licensee discretion. Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). Mr. Chief Justice Burger, writing for the majority, concluded from a review of legislative history that "Congress intended to permit private broadcasting to develop with the widest journalistic freedom consistent with its public obligations." *Id.* at 110, 93 S.Ct. at 2090. In addition, we have "made it clear that unlike those corollaries to the doctrine that create equal-opportunities situations the doctrine itself does not create a right for any person or group to be granted time." Democratic National Committee v. F. C. C., *supra,* 148 U.S. App.D.C. at 395, 460 F.2d at 903. "The licensees may exercise their judgment as to what material is presented and by

whom . . . . The fairness doctrine is issue-oriented, and it would be sufficient if each licensee could show that the point of view advocated by petitioner . . . had been or was being presented on its station by others." Green v. F. C. C., 144 U.S.App.D.C. 353, 358, 447 F.2d 323, 328 (1971). "Thus in opinion after opinion, the Commission and the courts have stressed the wide degree of discretion available under the fairness doctrine and we have clearly stated time after time, *ad infinitum ad nauseam,* that the key to the doctrine is no mystical formula but rather the exercise of reasonable standards by the licensee." Democratic National Committee v. F. C. C., *supra*, 148 U.S.App.D.C. at 395, 460 F.2d at 903. And in our recent *Democratic National Committee* case we held unequivocally that a Presidential address does not automatically give rise to a special right to respond. *Id.*, 148 U.S.App.D.C. at 396–397, 460 F.2d at 904–905.

██ In light of these established principles it is clear that DNC was not entitled automatically to any right to reply. That there is no equal-opportunities rule in the context of the fairness doctrine is now beyond dispute. The Commission must look to all the relevant facts and circumstances to determine whether the public had been left uninformed of opposing viewpoints during the period in question and the burden is on the petitioner to show that the networks had not exercised reasonable judgment in this regard. We feel that the Commission was completely justified in finding in this case that no such showing had been made. It correctly concluded that in light of "the extensive coverage which the networks appear to have given to the current issue, including presentation of contrasting viewpoints on their news and interview programs, as well as some special programs they have cited . . . we cannot find that the broadcast licensees have acted unreasonably or left the American

Under the Fairness Doctrine and the Public Interest Standards of the Communications Act, First Report, 37 Fed. Reg. 12744, 12746–47 (1972).

people uninformed on the issue of the economic program." (J.A. 209–10, 211).

■ Moreover, even if a right of reply were warranted, we again reiterate that the networks have discretion in the selection of the appropriate spokesmen. Especially relevant in this regard is our statement in *Democratic National Committee, supra,* involving the same petitioner as well as a Presidential address on the issue of the economy:

> Furthermore, they [DNC] assert that as the leading party out of the White House and as the majority party in Congress they would always be an appropriate party to respond. DNC feels it is obligated to inform the nation of the viable options open to it. Should this be DNC's manifest destiny we can find no reason to compel the networks to assist it. Can it be *said that others are not equally* capable of the task? At times the President speaks to crucial problems to which other groups are far more qualified to speak. DNC and its representatives have *no greater claim to ex*pertise in the area of the economy than the National Chamber of Commerce or the president of the New York Stock Exchange, and that is the point; crucial issues must be reasonably aired after consideration of the viewpoints of. all significant factions. This is a matter for licensee discretion and not automatic rule because the speaker is the President of the United States.

148 U.S.App.D.C. at 402, 460 F.2d at 910.

■ Petitioners also vigorously claim that the facts of this case are indistinguishable from those in *Fair Committee.* We are convinced the Commission was correct in ruling to the contrary. The scope of the holding in *Fair Committee* was very carefully circumscribed by the Commission in its fear that it would be considered a step towards a modified equal-opportunities rule. In other words, it correctly envisioned the inevitability of a case such as this. In recog-

nizing that *Fair Committee* was an exception to the mainstream of fairness doctrine cases, the Commission stated:

> We wish to stress that we are not holding that such an obligation arises from a single speech—that where an uninterrupted address is afforded one side, the fairness doctrine demands that the other side be presented in the same format. . . . *Rather, our holding here is based upon the unusual facts of this case*—five addresses by the outstanding spokesman on one side of an issue.

(emphasis added). 25 F.C.C.2d at 297. Indeed, the F.C.C. emphasized that "the question of reasonableness calls for a judgment on the facts of each case." *Id.* at 295. The Commission repeatedly underscored the unique facts of that case, mentioning over and over that the President had appeared *five times* on *prime-time* television and radio to deliver *uninterrupted* messages justifying his Indochina policy. In this case there were only two Presidential prime-time broadcasts accompanied by two other *non*-prime-time appearances. Comparison of the total prime-time coverage reveals only 36 minutes in this case as compared with 132 minutes in *Fair Committee.* The Commission declined to "add in" Secretary Connally's press conferences, stating that he "was subject in the three press conferences to the same kind of critical questioning that he would have faced on news interview programs, and his appearances were neither uninterrupted nor in prime time." J.A. 208. In light of the special emphasis placed on the *Presidential* and the *uninterrupted* nature of the addresses involved in *Fair Committee,* we cannot say the Commission was incorrect in this regard.

That such distinctions as these perhaps seem overly refined is a direct consequence of DNC's attempts to convert the "reasonable under the circumstances" rule to a more rigid, mathematical "modified equal-opportunities" doctrine—the very result the Commission was most cautious to avoid in deciding

*Fair Committee.* The Commission declined in this case to extend *Fair Committee* for precisely that reason. The Commission declared its belief that extension of its earlier decision would result in a "whittling away" of basic fairness doctrine principles and lead to the substitution of an equal-opportunities approach which Congress had expressly rejected. J.A. 209. The Commission further expressed its fear that a broad interpretation of its earlier decision would "lead us down a slippery slope with a consequent undesirable diminution of licensee responsibility . . . [since] a continuing series of *ad hoc* rulings by the Commission which necessarily constitute special departure from the general fairness weighing process would inevitably push the Commission further and further into the programming process." [5]

We find the Commission was correct in refusing to venture upon such dangerous waters. In light of the factual distinctions between this case and *Fair Committee,* and in view of the fact that the networks had adequately fulfilled their obligation to inform the public on the issue of the economy, as determined by the Commission, we cannot say that the Commission erred in holding that this particular pattern of Presidential

addresses was not so intense as to give rise to a right of response. The decision of the Commission is therefore

Affirmed.

---

5. J.A. 209. In the Commission's words:
   We believe that extension of the *Committee for Fair Broadcasting* ruling to the present situation would result in whittling away the basic fairness doctrine concept of reasonable opportunity for presentation of contrasting views in overall programming, and, as noted above, move us toward an "equal opportunities" requirement which we have consistently refused to adopt. . . .
   Moreover, extension of the *Fair Broadcasting* ruling to the facts of this case would lead us down a slippery slope with a consequent undesirable diminution of proper licensee responsibility. If, for example, we were now to hold that the broadcast of two prime-time Presidential addresses and two not in prime time (including the extra radio address) requires the networks to af-

ford additional time for response despite their other presentations on the issues and without any showing of overall unfairness, what ruling would be appropriate if there were only one prime-time plus three non-prime-time addresses? or one prime-time plus two non-prime-time speech [sic], with or without one or more non-prime-time press conferences by a Cabinet member? Of course, the making of distinctions is a normal function of the application of policy; but a continuing series of *ad hoc* rulings by the Commission which necessarily constitute special departures from the general fairness weighing process would inevitably push the Commission further and further into the programming process. We believe this to be both undesirable and not required by the situation.