**LARUS & BROTHER COMPANY, Inc., t/a the House of Edgeworth, et al., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**The Tobacco Institute, Incorporated, et al., Intervenors.**

No. 15382.

United States Court of Appeals, Fourth Circuit.

Argued May 5, 1971.

Decided Aug. 20, 1971.

Abe Krash, Washington, D. C. (Daniel A. Rezneck, Jerome I. Chapman, Stephen M. Sacks, and Arnold & Porter, Washington, D. C., Lewis F. Powell, Jr., John W. Riely, and Hunton, Williams, Gay, Powell & Gibson, and Fielding L. Williams, Jr., and Williams, Mullen & Christian, Richmond, Va., on the brief), for petitioners and intervenors.

John H. Conlin, Associate Gen. Counsel (Richard E. Wiley, Gen. Counsel, and Stuart F. Feldstein, Counsel, Federal Communications Commission, and Richard W. McLaren, Asst. Atty. Gen., and Gregory B. Hovendon, Atty., Department of Justice, on the brief), for respondents.

Frank A. Fritz, Thomas C. Platt, Craig D. Walley and Bleakley, Platt, Schmidt, Hart & Fritz, New York City, on the brief for amicus curiae, National Tuberculosis and Respiratory Disease Ass'n.

Granville Whittlesey, Jr., Donovan, Leisure, Newton & Irvine, New York City, on the brief for amicus curiae, American Cancer Society, Inc.

Before WINTER, BUTZNER, and RUSSELL, Circuit Judges.

BUTZNER, Circuit Judge:

The Tobacco Institute and a number of cigarette manufacturers petitioned to review a report and order of the Federal Communications Commission.[1] We affirm the Commission's ruling that licensees who broadcast announcements discouraging cigarette smoking as a health hazard are not required by the fairness doctrine to grant time for the presentation of opposing views.

■ In anticipation of the forthcoming statutory ban on advertising cigarettes by radio and television,[2] the FCC issued a notice of inquiry inviting comment on regulatory policy, with particular regard to the application of the fairness doctrine to broadcasting of anti-smoking messages. Since the doctrine requires the presentation of opposing views on controversial issues of public importance,[3] the Commission's inquiry dealt largely with whether the effect of cigarette smoking on health remained a controversial issue.

After receiving comments from interested parties, the Commission ruled that, in the light of developments, it would be reasonable for a broadcaster to determine that the health hazards of smoking no longer present a controversial issue.[4] Consequently, the Commission held, television and radio stations that carry anti-smoking announcements need not grant free time to broadcast opposing views. The Commission cautioned, however, that outside the context of a specific complaint it could not properly issue a blanket ruling on every anti-smoking message. It further admonished that the fairness doctrine would apply to anti-smoking broadcasts over which substantial controversy might arise.

I.

The petitioners attack the ruling of the Commission as arbitrary and capricious because in their view the Commission has failed to state a reasoned basis for repudiating its prior position that the effect of smoking on health is a controversial issue subject to the fairness doc-

1. Jurisdiction is based on 47 U.S.C. § 402 (a) and 28 U.S.C. § 2342(1). Contrary to the Commission's assertion, its order is reviewable at this time. 5 U.S.C. §§ 551(13), 702 and 704. Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Columbia Broadcasting System v. United States, 316 U.S. 407, 416, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942).

2. The Public Health Cigarette Smoking Act of 1969 (15 U.S.C. § 1335) provides:
    "After January 1, 1971, it shall be unlawful to advertise cigarettes on any medium of electronic communication subject to the jurisdiction of the Federal Communications Commission."

3. The fairness doctrine, which has its roots in the earliest regulatory decisions involving use of the air-waves, see Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 375, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), reflects the duty of radio and television licensees "to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance." Communications Act § 315(a), 47 U.S.C. § 315(a). See generally Green v. FCC, 447 F.2d 323, 327 (D.C.Cir. 1971); Retail Store Employees Union, Local 880 Retail Clerks International Ass'n v. FCC, 436 F.2d 248, 256 (D.C.Cir. 1970); In re Obligations of Broadcast Licensees Under the Fairness Doctrine, 23 F.C.C.2d 27 (1970); Report on Editorializing by Broadcast Licensees, 13 F.C.C. 1246 (1949).

4. The Commission, one member dissenting, also held that broadcasters would not be required by rule to devote significant time to anti-smoking messages. No review is sought of this aspect of the Commission's ruling.

trine. They add that the Commission failed to articulate any objective standard for determining when an issue ceases to be controversial. The petitioners emphasize the following facts as showing that the Commission has consistently regarded the hazards of smoking as controversial. In 1967, the Commission ruled that the fairness doctrine obliged stations broadcasting cigarette commercials to allow time for anti-smoking messages.[5] A short time later, in response to an inquiry by a licensee, the Commission ruled that a broadcaster who declined cigarette commercials would be required to carry pro-smoking messages if he broadcast anti-smoking announcements.[6] Finally, and most significantly, according to the petitioners, the Chairman of the Commission repeatedly represented to Congress during the hearings on the Public Health Cigarette Smoking Act of 1969 that the fairness doctrine would apply after the broadcasting ban went into effect.

■ The Commission's ruling, of course, cannot be faulted simply because it represents a shift from an earlier holding. FCC v. WOKO, Inc., 329 U.S. 223, 228, 67 S.Ct. 213, 91 L.Ed. 204 (1946). Our inquiry, therefore, is whether the Commission articulated with reasonable clarity a rational basis for its change of view. See Greater Boston Television Corp. v. FCC, 444 F.2d 841, 850 (D.C.Cir., 1970). As Judge Leventhal emphasized, "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored. * * *" 444 F.2d at 852.

■ In stating its reasons, the Commission first reiterated a well established principle of the fairness doctrine that "it is up to the licensee to make a reasonable, good faith judgment on the basis of the particular facts before him * * * whether he has presented one side of a controversial issue. * * *" The Commission next stressed that the critical issue is "the licensee's judgment *today*— directed to the circumstances before him." Finally, it pointed to "significant developments" since the Surgeon General's 1964 report touched off substantial controversy about the effect of cigarette smoking on health. Specifically, the Commission referred to the 1967, 1968 and 1969 reports of the Department of Health, Education and Welfare,[7] the change in the warning on cigarette packages, and the broadcasting ban imposed by the Public Health Cigarette Smoking Act of 1969.[8]

■ The significance of the HEW reports is disclosed by extracts contained in the Senate Report on the Public Health Cigarette Smoking Act of 1969.[9] There

5. In re Television Station WCBS–TV, New York, N. Y., Applicability of the Fairness Doctrine to Cigarette Advertising, 9 F.C.C.2d 921 (1967), aff'd *sub nom.* Banzhaf v. FCC, 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969).

6. Letter to Larry Jonas, KBMC–FM, Nov. 2, 1967, 8330–S, C9–1304. See also, Tobacco Institute, Inc., 11 P & F Radio Reg.2d 987, 988 (1967).

7. The reports were made pursuant to § 5 (d)(1) of the Cigarette Labeling and Advertising Act of 1965. See also 15 U.S.C. § 1337(a).

8. Section 2 of the Public Health Cigarette Smoking Act of 1969 (amending the Cigarette Labeling and Advertising Act of 1965). 15 U.S.C. §§ 1333, 1335.

9. The Senate Report states in part:

"Following are significant conclusions from the HEW reports, 'The Health Consequences of Smoking, 1967, 1968, and 1969: Smoking and Cardio-Vascular Disease':

1967—'* * * evidence not only confirms the fact that cigarette smokers have increased death rates from coronary heart disease, but also suggests how these deaths may be caused by cigarette smoking.' 'Cigarette smoking males have a higher coronary heart disease death rate than nonsmoking males. This death rate may, on the average, be 70 percent greater, and, in some, even 200 percent greater or more in the presence of other known "risk factors" for coronary heart disease.'

1968—'Because of the increasing convergence of epidemiological and physiological findings relating cigarette smoking to coronary heart disease, it is con-

can be no doubt that Congress relied in part on the HEW reports when it enacted the Public Health Cigarette Smoking Act of 1969. Given this precedent, the Commission properly turned to these reports to reach its conclusion, finding in them "overwhelming evidence on the general public health aspects of cigarette smoking."

■ Also quite properly, the Commission relied on the 1969 Act to undergird its ruling. The label required in the Act of 1965—"Caution: Cigarette Smoking May be Hazardous to Your Health"—was made more positive by the Act of 1969—"Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous to Your Health." More importantly from the standpoint of the Commission, Congress banned cigarette advertising from the air. The enactment of this legislation entitled the Commission to draw the inference that Congress had been persuaded that evidence purporting to establish the hazards of smoking was essentially valid. The Commission, therefore, was justified in reaching the conclusion that, regardless of its former views on the controversy over cigarettes, it is now reasonable for a licensee to assume that the detrimental effects of cigarette smoking on health are beyond controversy.

■ We cannot accept the petitioners' suggestion that the Chairman of the Commission, testifying at legislative hearings, made representations about the fairness doctrine that precluded the Commission's ruling.[10] Both the Chairman's

cluded that cigarette smoking can contribute to the development of cardiovascular disease and particularly death from coronary heart disease.'

1969—'Further data from prospective studies confirm the judgment that cigarette smoking is a significant risk factor that contributes to the development of coronary heart disease, apparently by promoting myocardial infarct and cardiac arrhythmias.'

Smoking and chronic obstructive bronchopulmonary diseases (emphysema and bronchitis):

1967—'It—cigarette smoking—greatly increases the risk of dying not only from chronic bronchitis but also from pulmonary emphysema.' 'Even relatively young cigarette smokers frequently have demonstrable respiratory symptoms and reduction in ventilatory function.'

1968—'Additional physiological and epidemiological evidence confirms the previous findings that cigarette smoking is the most important cause of chronic nonneoplastic bronchopulmonary disease in the United States.'

Smoking and cancer

1968—'Additional evidence substantiates the previous findings that cigarette smoking is the main cause of lung cancer in men. Cigarette smoking is causally related to lung cancer in women * * *.' 'Smoking is a significant factor in the causation of cancer of the larynx and in the development of cancer of the oral cavity.'

1969—'More studies have been done to identify those substances in tobacco smoke which take part in carcinogenesis. These studies may help to define the exact biomechanisms involved in the cause and effect relationship between cigarette smoking and lung cancer.'" S.Rep.No.91–566, 91st Cong., 1st Sess., p. 3, 2 U.S.Code Cong. & Admin.News pp. 2652, 2654 (1970).

10. Illustrative of the testimony on which the petitioners rely is the following colloquy with Senator Moss:

"Senator Moss. Something was said this morning about there might be a turnaround of the fairness doctrine the other way; that in the event there were a number of these educational, antismoking showings, that perhaps there ought to be a right of the tobacco industry to come in the fairness doctrine and state its pro side over again.

What is your response to that?

"Mr. Hyde. There may well be an advantage in that, Senator. Let me explain. The fairness doctrine in principle holds that the public is entitled to hear both sides of the proposition or both sides of the issue which is controversial, and affects the public interest.

Now, it is quite possible that, if a station carries an anticigarette smoking presentation, that more attention could be attracted to that presentation if you had the other side of the argument available at the same time.

testimony and the Commission's order recognized that, notwithstanding the ban on advertising, under certain circumstances the fairness doctrine could require the presentation of the cigarette manufacturers' views. Moreover, the Chairman noted that he was speaking unofficially in answering the questions put to him and that he was not giving a studied opinion on behalf of the Commission.[11] The Chairman's testimony, therefore, did not prevent the full Commission from subsequently reassessing the existence of controversy over the smoking and health issue. The fairness doctrine requires a current judgment, and it would lose its vitality if the Commission and licensees could not reasonably determine on facts before them that an issue is no longer controversial.

■ We conclude, therefore, that the Commission did not act arbitrarily or capriciously, that its report and order sufficiently explain the reasons for its new rules, and that the objective data on which the Commission relied were adequate to justify its change of course.

## II

The tobacco industry, having acquiesced in the statutory ban on radio and television advertising, does not challenge the constitutionality of the Public Health Cigarette Smoking Act of 1969.[12] The petitioners, however, contend that the Commission violated the first amendment and §§ 326 and 315 of the Communcations Act by authorizing licensees to broadcast anti-smoking messages without requiring them to present the opposing point of view on the theory that the smoking and health issue has ceased to be controversial. In support of their position, the petitioners refer to the Com-

What I am suggesting is that a good, sharp argument might attract more attention than a presentation of simply one side of the issue.

"Senator Moss. For that reason you wouldn't necessarily oppose the statement of the pro side if the anti side was permitted to continue?

"Mr. Hyde. That is right. But let me indicate how this operates.

The fairness doctrine says that if a station presents one side of an issue of public importance, a controversial issue of public importance, they must provide some reasonable opportunity for the presentation of other viewpoints.

Now, assuming there is no cigarette advertising as such, but simply a presentation of what we might classify as an educational presentation to discourage the use of a product which the Surgeon General has found harmful to health. In that situation fairness would require that there be some reasonable opportunity for the presentation of the other viewpoint as long as this remains in controversy. This doesn't mean that the other viewpoint should be presented in an advertising form. It simply means that some other spokesman, one knowledgeable, we trust, would present the other side of the argument, so that the public could have all of the relevant viewpoints upon which to make their judgment.

It is not an invitation to advertising. It is not an invitation to equal time.

It simply calls on the broadcaster to make some reasonable provision for the presentation of the other side of the argument on which he has presented the "first argument."

Hearing on H.R. 6543 Before the Consumer Subcommittee of the Senate Commerce Committee, 91st Cong., 1st Sess., p. 160 (1969) ; see also id. at 161 and 162; Hearings on H.R. 643 Before the House Committee on Interstate and Foreign Commerce, 91st Cong., 1st Sess., Part 1, pp. 209 and 226 (1969).

11. Hearing on H.R. 6543 Before the Consumer Subcommittee of the Senate Commerce Committee, 91st Cong., 1st Sess., p. 162 (1969).

12. In a prepared statement, Joseph P. Cullman, III, Chairman of the Board of Directors and Chief Executive Officer, Philip Morris, Inc., and Chairman of the Executive Committee, the Tobacco Institute said:

"I am further authorized to inform the committee that if the broadcast industry will simultaneously terminate all contractual arrangements for the broadcast of cigarette advertising, we are prepared to agree to discontinue all such advertising at any time after December 31, 1969, that such termination becomes effective." Hearing on H.R. 6543 Before the Consumer Subcommittee of the Senate Commerce Committee, 91st Cong., 1st Sess., p. 79 (1969).

mission's statement that it will consider a licensee's treatment of the effect of smoking on health when it assesses the station's overall public service performance at renewal time. This warning, say the petitioners, coupled with the Commission's refusal to compel pro-smoking announcements amounts to coerced presentation of the "official government view." Such coercion, the petitioners suggest, is just as truly censorship and abridgment of the freedom of speech and press as would be a rule explicitly requiring anti-smoking announcements and forbidding pro-smoking information.

On its face, the Commission's order does not censor information about smoking in violation of § 326 of the Communications Act.[13] The order neither compels nor denies access to the petitioners' views but leaves program decisions on this issue to each licensee's discretion. The Commission specifically rejected a rule requiring stations to carry anti-smoking announcements, and it did not forbid them from broadcasting pro-smoking messages. Moreover, it carefully admonished that certain types of anti-smoking programs were subject to the fairness doctrine. Of course, an order or regulation valid on its face may be administered unlawfully. But petitioners have not cited any instances of coercion, and no broadcaster has petitioned for review because of the pressures the petitioners detect.

Section 315 of the Communications Act,[14] as amended in 1959, provides a statutory basis for the Commission's pre-existing version of the fairness doctrine and imposes "a duty on broadcasters to discuss both sides of controversial public issues." Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 380, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). The fairness doctrine must be administered by the Commission to enhance, not inhibit, the rights secured by the first amendment.[15] In *Red Lion*, the landmark case on the doctrine, Mr. Justice White wrote:

"It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee. * * * It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here. That right may not constitutionally be abridged either by Congress or by the FCC." 395 U.S. at 390, 89 S.Ct. at 1806.

The channels of radio and television transmission are public property entrusted to licensees as proxies or fiduciaries of their communities. 47 U.S.C. § 301; 395 U.S. at 389, 89 S.Ct. 1794. But the licensees are not deemed common carriers. 47 U.S.C. § 153(h). Limitations of time and frequencies make it impracticable for them to accept every tendered program. Recognizing this, the Commission has applied the fairness doctrine only to controversial issues of public importance, and *Red Lion* has placed its constitutionality beyond question.

13. Title 47 U.S.C. § 326:

"Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication."

14. Title 47 U.S.C. § 315(a) deals generally with the use of broadcast facilities by candidates for public office. It further provides:

"Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance."

15. See generally, Note, A Fair Break for Controversial Speakers: Limitations of the Fairness Doctrine and the Need for Individual Access, 39 Geo.Wash.L.Rev. 532 (1971).

As we noted in Part I, the Commission stated a rational basis for its decision that a broadcaster could reasonably determine that the effect of smoking on health was no longer controversial. However, knowledge of the effect of smoking is not static, and many aspects of this subject may still generate controversy. As to them, the Commission ruled the public is entitled to hear various points of view, including the tobacco industry's. The Commission cited particular studies, statistics, and proposals for remedial action as examples of potential controversy to which the fairness doctrine would apply. The Commission's ruling that the fairness doctrine applies to those aspects of the effect of smoking on health that remain controversial, but not to those that may now be deemed beyond controversy, provides the public "suitable access" to this issue and therefore satisfies both § 315 of the Communications Act and the first amendment. Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

In contrast, controversy is not essential to a station's obligation to present programs about the effect of smoking on health. This duty does not rest merely on the fairness doctrine. The *fundamental basis of this obligation is the licensee's responsibility to serve the public interest by providing information about cigarettes' unique threat to public health.* Banzhaf v. FCC, 132 U.S.App. D.C. 14, 405 F.2d 1082, 1091 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969); see Green v. FCC, 447 F.2d 332, 333 (D.C.Cir. June 18, 1971). A station's treatment of this subject is pertinent to renewal of its license. From its inception, the Commission's licensing function has involved not only examination of technical facilities, but also evaluation of the services a station renders the public. 47 U.S.C. §§ 307, 309; National Broadcasting Co. v. United States, 319 U.S. 190, 216, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). We find, therefore, no error in the Commission's continued recognition of the effect of smoking on the public welfare or in its statement that it will consider the treatment of this subject when it assesses a station's overall public service performance.

Affirmed.