**Dorothy HEALEY, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**Metromedia, Inc., Intervenor.**

**No. 24630.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 15, 1971.

Decided March 3, 1972.

Mr. Thomas R. Asher, Washington, D. C., for petitioner. Mr. Melvin L. Wulf, New York City, was on the brief for petitioner. Mrs. Hope Eastman, Washington, D. C., also entered an appearance for petitioner.

Mr. Richard R. Zaragoza, Counsel, Federal Communications Commission, with whom Messrs. Richard E. Wiley,

General Counsel at the time the brief was filed, and John H. Conlin, Associate General Counsel at the time the brief was filed, were on the brief, for respondents. Mr. Howard E. Shapiro, Atty., Department of Justice, also entered an appearance for respondents.

Mr. Thomas J. Dougherty, Washington, D. C., for intervenor.

Before ROBINSON and WILKEY, Circuit Judges, and A. SHERMAN CHRISTENSEN,* United States Senior District Judge for the District of Utah.

WILKEY, Circuit Judge:

Petitioner Dorothy Healey seeks review and reversal of the Federal Communications Commission order and decision[1] denying her request that the FCC require television station KTTV of Los Angeles[2] to allow her air time to respond to a commentary by one George Putnam carried by the station on its 4:30 and 10:00 p. m. "News Reports" on 17 February 1969. We sustain the Commission's ruling that the licensee did not violate the fairness doctrine in denying petitioner's request, in that the licensee's exercise of judgment on petitioner's request was not shown to be unreasonable, arbitrary, or in bad faith.

I. *The Petitioner and the Broadcast Giving Rise to the Complaint*

According to petitioner's brief, this case thus originated:

On Sunday, February 16, 1969, the *Los Angeles Times* featured a profile of the petitioner entitled "Patriot-Marxist—L. A.'s Number One Red Finds the U.S. Isn't All Bad." Reciting that petitioner is "a Marxist, a Communist and an atheist," the profile stated that "Dorothy Healey might be considered an exemplary American and a good member of the bourgeoisie . . . she owns her home, pays her taxes, cares for her aged mother, dotes

on her scholarly son and generally likes folks, young and old. She professes a sincere patriotism, and for years, while her son was in school, she rarely missed a meeting of the P.T.A.

Describing Mrs. Healey's early commitment to Communism, the profile related the arrests and prosecutions that arose from her Communist identification. The devastating effect of these on her young son were developed. So, too, were her views on the bugging of her home and office and their consequences upon the lives of persons who had any associations with her.

The next day George Putnam devoted approximately six minutes of the licensee's 4:30 and 10:00 P.M. "News Reports" to an expression of his "rage" at the *Los Angeles Times*' story. Putnam quoted several portions of the *Times*' profile, and paraphrased its description of her career. Then, inter alia, referring to the *Times*' statement that Dorothy Healey "sobbed all night long" on hearing Krushchev's [sic] report concerning the horrors committed by Joseph Stalin, Putnam asked, "One can't help but wonder if she might have lost another night's sleep had Krushchev [sic] told us of his own extermination of millions of Ukranians by systematic starvation. Wonder if she ever heard about that?" Again, referring to the *Times*' telling of her home and office being bugged, Putnam remarked, "Actually, Mrs. Healey should be right at home with such tactics—because they're all too commonplace among the Communists."

Quoting the *Times*' statement that often parents of youths who have visited her are threatened with the loss of their jobs, Putnam said, "Come, come, now Dorothy—perhaps under Communism—perhaps under the Nazis—but it just doesn't happen in the

---

* Sitting by designation pursuant to 28 U.S. C. § 292(c) (1970).

1. 24 FCC 2d 487 (1970).

2. The licensee of station KTTV is Metromedia, Inc., an intervenor here.

United States of America." "Dorothy Healey may be the *Los Angeles Times'* kind of exemplary American . . .," Putnam concluded, "but she sure as hell is not mine. And, my fellow Americans, I trust she is not yours. And if you are as shocked as I am by this insult to American patriotism, I urge you to let the *Times* hear your voice loud and clear."[3]

By letter of 6 March 1969 the petitioner requested time for reply, which was rejected by the station. By letter of 26 March 1969 the petitioner requested the FCC to "review this matter and take action calculated to secure for Mrs. Healey time to reply, to which, we submit, she is entitled under the rules and principles established by the F.C.C." The petitioner alleged that "[a] demand has been made and rejected that Mrs. Healey be given time to reply to the attack upon her." According to petitioner, the principles justifying this request were: "In the first place, your 'fairness doctrine' calls for the granting of equal time when 'an attack is made upon the honesty, character, integrity, or like personal qualities of an identified person or group.'" The letter then cited three specific items constituting the alleged "attack" on Mrs. Healey, namely (1) the reference to Khrushchev's extermination of millions of Ukranians, (2) the reference to the tactics of bugging, and (3) the reference to her associates being threatened with the loss of jobs, all as mentioned above.

After an FCC inquiry to the station, the station's reply justifying its action, and comment by petitioner Healey's attorney thereon to the FCC, the FCC on 24 June 1970 rejected the petitioner's complaint. On the ground that the FCC proceedings had consumed too much time already, without seeking reconsideration by the FCC, the petitioner appealed directly to this court.

## II. *Fairness Doctrine Standards and Agency Action Relative Thereto*

Recently we have had two occasions to speak on the FCC fairness doctrine in situations relevant here. In Democratic National Committee v. FCC (1972)[4] we upheld the FCC's resolution of various questions arising from the claims of *both* the Democratic and Republican National Committees under the fairness doctrine. In rejecting the claims of both private litigants, Judge Tamm wrote:

> The importance of the fairness doctrine is neither academic nor is it an administrative nicety. . . . The need for the doctrine is apparent to even the least initiated after considering that broadcast frequencies are indeed limited and "they have been necessarily considered a public trust. Every licensee who is fortunate in obtaining a license is mandated to operate in the public interest and has assumed the obligation of presenting important public questions fairly and without bias." . . . The importance of the doctrine is evident and it is the manifest intention of the Commission to maintain it as a viable instrument in protecting the right of the public to be fully informed on controversial issues.

> By its very nature the fairness doctrine is one which cannot be applied with scientific and mathematical certainty. There is no formula which if followed will assure that the requirements of the doctrine have been met. Procedurally, the doctrine can only succeed when the licensee exercises that discretion upon which he is instructed to call upon in dealing with coverage of controversial issues.[5]

Earlier in Green v. FCC (June 1971)[6] we upheld a ruling of the FCC that no violation of the fairness doctrine oc-

---

3. Brief for Petitioners, pp. 4–6.

4. 148 U.S.App.D.C. ——, 460 F.2d 891 (1972).

5. *Id.*, at 900, at 901 of 460 F.2d.

6. 144 U.S.App.D.C. 353, 447 F.2d 323 (1971).

curred by the licensees' declining to donate time to petitioners to broadcast messages opposing military service or informing the public of alternatives to compulsory military service, when the issue raised by the Armed Service recruitment announcements was the question of military manpower recruitment by voluntary means. In so doing, we pointed out that

> [to] invoke the fairness doctrine . . . there must exist a 'controversial issue of public importance' on which the licensee has refused to allow the presentation of a reasonably balanced point of view. . . . The Supreme Court itself enunciated two bases for the fairness doctrine: First, the statutory basis, that broadcast facilities must operate in the public interest; second, that under the First Amendment the public has a right to free and open debate.[7]

And finally,

> In our view, the essential basis for any fairness doctrine, no matter with what specificity the standards are defined, is that *the American public must not be left uninformed.*[8]

We take these standards enunciated in *Democratic National Committee, supra,* and *Green, supra,* as determinative of the case at bar.

For clarity we point out one standard which is not involved here. As the FCC decision states, "First, it is clear that the personal attack rules are in any event inapplicable. The rules specifically exempt from their scope commentary which is part of a bona fide newscast. That is the situation here."[9] On oral argument petitioner's counsel plainly stated that he was not urging the personal attack rule, that only the fairness doctrine itself was here involved.

Therefore, on this part of the FCC ruling we express no opinion.

As Judge Tamm wrote in *Democratic National Committee, supra,* " . . . we have clearly stated time after time, *ad infinitum ad nauseam,* that the key to the doctrine is no mystical formula but rather the exercise of reasonable standards by the licensee,"[10] and as we held in *Green, supra,* the burden is on the petitioner to establish that the "licensees' exercise of judgment under the fairness doctrine was unreasonable, arbitrary, or in bad faith."[11] As we further pointed out in *Green, supra,* "to invoke the fairness doctrine as a ground for obtaining access to the air waves, it is not only necessary to define a controversial issue of public importance, but implicitly it is first necessary to define the issue."[12]

## III. *Validity of the Agency Action Under the Fairness Doctrine*

### A. *The Issue*

In petitioner's initial complaint to the FCC, petitioner characterized the issue as "a demand has been made and rejected that Mrs. Healey be given time to reply to the attack upon her. . . . In the first place, your fairness doctrine calls for the granting of equal time when 'an attack is made upon the honesty, character, integrity or like personal qualities of an identified person or group.' . . . Certainly Mrs. Healey has been attacked both personally and as a member of the Communist Party and her patriotism has been challenged."[13] For the reasons stated above and now conceded by petitioner, this was rejected by both the licensee and later the FCC as not entitling the petitioner to reply under the personal attack category. However, in considering the entire texts

---

7. *Id.,* at 144 U.S.App.D.C. at 357, 447 F.2d at 327.

8. *Id.,* at 144 U.S.App.D.C. at 359, 447 F.2d at 329 (emphasis in original).

9. See note 1, *supra,* at 488.

10. See note 4, *supra,* at —— of 148 U.S.App. D.C., at 903 of 460 F.2d.

11. See note 7, *supra,* at 144 U.S.App.D.C. at 354, 447 F.2d at 324.

12. *Id.,* at 144 U.S.App.D.C. at 359, 447 F.2d at 329.

13. Complaint dated 26 March 1969, Joint Appendix, pp. 1–2.

of the *Los Angeles Times*' Sunday feature article and Putnam's six-minute broadcast, it seems fair to say that the article, the broadcast, and petitioner's initial demand to the licensee and the FCC did raise an issue in terms of petitioner's role as a Communist, and it was on this basis that both the licensee and the FCC evaluated the complaint in relation to the fairness doctrine.

Taking this as the issue, there is no question but that petitioner's side of the issue was never given air time by the licensee. The question before the FCC and on this appeal, then, is whether such an issue of petitioner's role as a Communist is a controversial issue of public importance.

On the other hand, three months after the newspaper article and the broadcast, and after the rejection of petitioner's request by both the licensee and the FCC, petitioner's counsel attempted to define the issue differently. By letter of 27 May 1969 petitioner's counsel asserted: "It [the broadcast] did involve matters of controversial nature and of public importance. The role played by individual communists in our society has been a matter of great public concern. . . . "[14] Later, petitioner's counsel in brief on this appeal shifted ground again, "But, actually, the issue presented by this attack on Mrs. Healey's character solely for her Communist beliefs and political activity is that of guilt by association."[15]

■ There is a world of difference between an issue defined as (1) the individual petitioner's role as a Communist in her community or in our society as a whole, and (2) "the role played by individual Communists in our society," or (3) the issue of "guilt by association." It might be plausibly maintained that the latter two issues have been and still are controversial issues of public importance, and if these issues were

raised by the Putnam broadcast, then the ultimate question would become the licensee's coverage of that particular issue, the licensee's fairness and balance in his presentation of programs dealing with that issue. Unfortunately for petitioner, however, on neither of these issues is there a scrap of evidence in the record as to what coverage the licensee did give. On a complaint under the fairness doctrine, the burden is not only on the complainant to define the issue, but also to allege and point specifically to an unfairness and imbalance in the programming of the licensee devoted to this particular issue. It is not enough for the complainant to allege there is a controversial issue of public importance on which the complainant wants to be heard on the licensee's station. The essential element in invoking the fairness doctrine is that the licensee has not hitherto provided fair and balanced programming on this particular issue, and therefore, and only therefore, can the complainant assert a right for somone to be heard to rectify the existing imbalance.

■ This the petitioner did not do here. Even after shifting ground from defining the issue as the petitioner's role as a Communist to defining the issue in much broader terms either as the role of Communists generally in our society or as guilt by association, there is neither allegation nor proof that this licensee failed to devote sufficient program time to these issues to present a fair and balanced view for the listening public.[16]

Therefore, if petitioner is to have any ground for complaint at all, we are relegated to the issue as defined by petitioner originally, her role as a Communist in the community or society generally. This, as we stated above, is a fair and correct definition of the issue as made by the *Los Angeles Times*' article and

---

14. Joint Appendix, p. 18.

15. See note 3, *supra*, at 9.

16. As to the rights and burdens of petitioner, had such allegations been made, *see* Hale v. FCC, 138 U.S.App.D.C. 125, 127–128, 425 F.2d 556, 558–559 (1970), *compare* Democratic National Committee v. FCC, 148 U.S.App.D.C. ——, 460 F.2d 907 (1972).

the complained-of-broadcast the day after, and this was the basis on which the FCC decided the case: "First, we note the licensee's judgment that the matter which you claim to be a controversial issue of public importance—the role played by you as a Communist—is not an issue of public importance in this area." [17]

### B. The Difference Between Interesting News and Important Public Issues

Petitioner's basic misapprehension here is a confusion of an issue over newsworthiness with a "controversial issue of public importance." Merely because a story is newsworthy does not mean that it contains a controversial issue of public importance. Our daily papers and television broadcasts alike are filled with news items which good journalistic judgment would classify as newsworthy, but which the same editors would not characterize as containing important controversial public issues.

And it was the issue of newsworthiness itself, the editorial judgment of the *Los Angeles Times*, which was raised and criticized by Putnam in the complained-of broadcast. In the first paragraph of his text he referred to "the story that appeared in the number one column on the number one page of Sunday's *Los Angeles Times*." In the third paragraph, "The *Los Angeles Times*, which chose not to even mention Abraham Lincoln's birthday—devoted more words to their 'patriot-Marxist.' Dorothy Healey, in their Sunday edition—and its [sic] voluminous—than any other news item or topic. Yes, more space for the Communist Dorothy Healey. . . . " And towards the close of the broadcast, "Well, in that lengthy and boring *Times* story she tells . . . " and later, "And so it goes—this long, and as I say, boring tale of the *Los Angeles Times*' 'Front page patriot.' " Putnam's final phrase was "I urge you to

let the *Times* hear your voice—loud and clear."

The above demonstrates that the prime object of Putnam's broadcast was to criticize the editorial judgment of the *Los Angeles Times*, to attack its opinion of what was newsworthy on that Sunday morning. We certainly are not called upon to arbitrate this controversy between the television and the newspaper journalists as to what is newsworthy; our question on this appeal is whether the Putnam broadcast raised a "controversial issue of public importance" under the fairness doctrine. It did not.

Even if we considered that the Putnam broadcast was primarily or substantially directed against petitioner Healey personally, there still was raised no controversial issue of public importance. In effect, the *Los Angeles Times* wrote a long article to prove that even an American Communist could be a nice, normal, ordinary housewife. The TV licensee's commentator disagreed; he questioned whether she really is a nice, normal, ordinary person. We fail to see the "controversial issue of public importance" here. Petitioner Healey has had favorable publicity on the front page of the Sunday *Los Angeles Times*, followed by six minutes repeated of substantially unfavorable publicity on the television station. Would any other Los Angeles housewife, similarly written and broadcast about, because of any other unusual aspect of her personal life, automatically became a controversial issue of public importance? We doubt it. In effect petitioner's rationale is: I am a Communist. I am (or was) a Communist leader in the Los Angeles area. Therefore, I am important. I am controversial. What I say and do is therefore a controversial issue of public importance.

The petitioner may be newsworthy—this is a question we leave to the editorial judgment of the *Times* and the licensee [18]—but we cannot see that this

---

17. Joint Appendix, pp. 22–23.

18. Mrs. Healey ran for the office of county assessor in 1966 and received 87,500 votes

(*Los Angeles Times*, Sunday, 16 Feb. 1969, Joint App., p. 17). She was at one time secretary and then chairman of the Communist Party in Southern California

57-year-old Communist housewife and her PTA activities, her children and their friends, qualify as a "controversial issue of public importance" under the fairness doctrine.

### C. *The Broad Effect of a Decision Upholding Petitioner's Complaint*

We are impelled to this conclusion, not only by evaluation of petitioner's single case, but our contemplation of the consequences generally of an opposite decision here. To characterize every dispute of this character as calling for rejoinder under the fairness doctrine would so inhibit television and radio as to destroy a good part of their public usefulness. It would make what has already been criticized as a bland product disseminated by an uncourageous media even more innocuous. It would discourage any television-radio commentary on newspaper editorials or news items. It would in every way inhibit that "robust public debate" that the fairness doctrine was born to enhance.

During fiscal year 1970 complaints to the FCC alleging violation of the fairness doctrine numbered 1,736 compared to 1,632 the previous year.[19] By elevating this Los Angeles housewife to the dignity of a "controversial issue of public importance," we would insure that the licensees and the FCC would be swamped by complaints under the fairness doctrine, and that the licensees' only defense would be to eliminate everything controversial from the air. Obviously, the American public would be the loser.

As we pointed out above, according to the Supreme Court in the *Red Lion* case,[20] the two foundations of the fairness doctrine are "first, the statutory basis, that broadcast facilities must operate in the public interest; second, that under the First Amendment the public has a right to free and open debate."[21] Further, " . . . the essential basis for any fairness doctrine, no matter with what specificity the standards are defined, is that the American public must not be left uninformed,"[22] Keeping in mind those standards and objectives, petitioner's complaint to the Federal Communications Commission under the fairness doctrine was properly rejected by the FCC, and we decline to reverse its ruling here.

So ordered.

(*Id.,* at 10), but was subsequently removed, apparently as a result of her opposition to the Soviet occupation of Czechoslovakia (Brief for Intervenor, p. 2, n. 4, citing Report of the Senate Fact-Finding Subcommittee on Un-American Activities to the 1970 Regular Session of the California Legislature (1970), 158–159).

19. Letter from FCC Counsel to Clerk of U.S. Court of Appeals for D.C. Circuit

dated 16 December 1971, quoting from 36th FCC Annual Report—Fiscal Year 1970, p. 62.

20. Red Lion Broadcasting Co., Inc. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

21. See note 7, *supra.*

22. See note 8, *supra.*