520 F.2d 1248
 POLISH AMERICAN CONGRESS and Thaddeus L. Kowalski, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Broadcasting Companies, Inc., Intervenor.
 No. 74-1412.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 27, 1975.
Decided July 23, 1975.
 
 Thaddeus L. Kowalski, Edmund A. Godula, Chicago, Ill., for petitioners.
 James A. McKenna, Jr., Carl R. Ramey, Washington, D. C., for intervenor.
 Ashton R. Hardy, Joseph A. Marino, R. Michael Senkowski, F. C. C., Washington, D. C., Carl D. Lawson, Dept. of Justice, Washington, D. C., for respondents.
 Before HASTINGS, Senior Circuit Judge, and CUMMINGS and STEVENS, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 This petition asks us to set aside an order of the Federal Communications Commission denying the complaint of petitioners that American Broadcasting Companies, Inc. ("ABC") violated the Federal Communications Commission's fairness doctrine and personal attack rule by refusing petitioners air-time to respond to an August 10, 1972, broadcast of the Dick Cavett Show containing Polish jokes.
 
 
 2
 During the program in question, comedian Bob Einstein, masquerading as Gil Drabowski, president of an imaginary Polish Anti-Defamation League, told four "Polish jokes," all denigrating the intellectual or motor skills or personal hygiene standards of Poles. The show was hosted by comedian Steve Allen. The setting was an interview of Einstein by Allen regarding a fictitious lawsuit against the three television networks brought by Drabowski on behalf of his organization, demanding a public apology for Polish jokes told on the networks and endeavoring to make sure that there would be no more Polish jokes broadcast by the networks. Thereafter, in jest, Drabowski gave the four objectionable jokes assailed by petitioners, as examples of those shown by the networks for which his organization thought an apology was required.[1] As a result of a protest by petitioners and others, on the following evening Steve Allen explained that Einstein's comedy sketch involving Polish jokes was intended to amuse "just as the 'All in the Family' show, which is the No. 1 show in the country, intends to amuse when it does jokes about the Polish, Italians, and every group in the world." Allen then stated that he, Bob Einstein and ABC apologized to those who were offended. Although Allen indicated that he had invited a spokesman for a protesting Polish American organization to "speak his piece" during the August 11th show, no such spokesman appeared.
 
 
 3
 On October 4, 1972, petitioners wrote ABC requesting "equal time" to reply "under Federal Communications Commission Regulations" to the August 10th telecast. ABC replied as follows on October 31st:
 
 
 4
 "We are sorry that anything said or done by either Steve Allen or Bob Einstein offended you. The following evening Steve Allen apologized on behalf of himself, Mr. Einstein and the ABC Television Network.
 
 
 5
 "No harm or malice towards Polish-Americans was intended and we are most sincerely regretful that you were hurt or offended.
 
 
 6
 "For your information, 'equal time' under Section 315 of the Communications Act is limited in scope to candidates for public office and, accordingly, we respectfully decline your 'equal time' request."
 
 
 7
 Eight months thereafter, petitioners filed a complaint with the Commission, requesting it to rule under the personal attack rule of the fairness doctrine and under the fairness doctrine itself that petitioners were entitled to equal time or a reasonable opportunity to respond free of charge on the ABC network "to the personal attacks on the character, intelligence, hygiene or appearance of members of the Polish American community, an identifiable group," on the August 10th telecast. The complaint contended that demeaning and defamatory attacks in the guise of ethnic humor constituted a controversial issue of public importance "because such programming represents a single warped and negative point of view which has an enormous influence on the viewing audience."
 
 
 8
 On September 26, 1973, the Commission's Broadcast Bureau denied petitioners' complaint, noting at the outset that Section 326 of the Federal Communications Act (47 U.S.C. § 326) prohibits the Commission from censoring broadcast material.[2] Under the fairness doctrine, the Broadcast Bureau acknowledged that if a station presents one side of a controversial issue of public importance, it is required to afford reasonable opportunity for the presentation of contrasting views. The Bureau's ruling further stated:
 
 
 9
 "It is the responsibility of the broadcast licensee to determine whether a controversial issue of public importance has been presented and, if so, how best to present contrasting views on the issue. The Commission will review complaints to determine whether the licensee can be said to have acted reasonably and in good faith.
 
 
 10
 "In support of your contention that the broadcast of Polish jokes constitutes a controversial issue of public importance, you state that the jokes 'belittle a large segment of the population' by perpetuating a 'dumb Polack image.' However, you have not shown that there is any controversy in this country concerning the intelligence or other qualities of Polish Americans. (Footnote omitted.) Accordingly, we are unable to find from the evidence presently before us that ABC was unreasonable in concluding that the broadcast of the jokes and attendant remarks did not constitute the discussion of a controversy of public importance.
 
 
 11
 "Since we have determined that the network was not unreasonable in concluding that no controversial issue of public importance was involved, the broadcast of the Polish jokes could not constitute, under the Commission's rules, a personal attack. In order for the personal attack rule to be applicable, the attack must occur during the discussion of a controversial issue of public importance. Section 73.123(a) of the Commission's Rules and Regulations. Even had a controversial issue of public importance been involved here, it does not appear that these jokes and attendant remarks could have constituted a personal attack under the Commission's rules. The statement of a particular view, however strongly or forcefully made, does not necessarily constitute a personal attack. The Port of New York Authority, 25 FCC 2d 417 (1970). To qualify under the Commission's rule, the attack must reflect upon the 'honesty, character, integrity or like personal qualities' of a person or group, and not merely reflect upon ability, knowledge or like intellectual or motor skills."
 
 
 12
 Subsequently, the petitioners applied to the full Commission for a review of the Broadcast Bureau's ruling. The application was denied. 46 F.C.C.2d 124 (1974). Again the Commission reminded petitioners that Section 326 of the Act prohibits it from interfering with broadcasters' rights of free speech. After expressing its approval of the Broadcast Bureau's ruling that no controversial issue of public importance had been shown, the Commission echoed the Bureau's alternate rationale that the personal attack rule only applies where an attack is made "upon the honesty, character, integrity or like personal qualities of an identified person or group." Even assuming that a controversial issue of public importance had been involved, the Commission held that the personal attack rule does not apply to these jokes because there was no "attack on those personal qualities bearing on the moral rectitude or personal credibility of the named individual or group," citing Rome Hospital and Murphy Memorial Hospital, 40 F.C.C.2d 452, 453 (1973). This petition for review followed.
 
 Fairness Doctrine and Personal Attack Rule
 
 13
 The fairness doctrine evolved by the Commission requires a broadcaster to devote a reasonable percentage of broadcasts to the coverage of public issues, and that coverage must provide an opportunity for the presentation of contrasting points of view. See In Re the Handling of Public Issues Under the Fairness Doctrine and the Public Interest Standards of the Communications Act, 48 F.C.C.2d 1, 7 (1974). In 1959 the fairness doctrine was recognized in an amendment to 47 U.S.C. § 315(a).[3] As stated by the Supreme Court, under the fairness doctrine "The broadcaster must give adequate coverage to public issues (citation omitted) and coverage must be fair in that it accurately reflects the opposing views." Red Lion Broadcasting Co. v. Federal Communications Commission, 395 U.S. 367, 377, 89 S.Ct. 1794, 1800, 23 L.Ed.2d 371; see also Columbia Broadcasting System v. Democratic National Committee, 412 U.S. 94, 111, 93 S.Ct. 2080, 36 L.Ed.2d 772; Democratic National Committee v. Federal Communications Commission, 148 U.S.App.D.C. 383, 460 F.2d 891, 899 (1972), certiorari denied, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82; In Re Obligations of Broadcast Licensees Under the Fairness Doctrine, 23 F.C.C.2d 27, 28 (1970).
 
 
 14
 The rule on personal attacks, like that on political editorials, is a Commission rule setting out an aspect of the fairness doctrine. See Red Lion, supra, 395 U.S. at 383-386, 89 S.Ct. 1794. The personal attack rule's application is specifically confined to a situation where the attack occurs "during the presentation of views on a controversial issue of public importance."[4] The confinement of the rule's application to "controversial issues of public importance" parallels an identical limitation on the application of the more general fairness doctrine. See Columbia Broadcasting System, supra, 412 U.S. at 111-112, 93 S.Ct. 2080; Healey v. Federal Communications Commission, 148 U.S.App.D.C. 409, 460 F.2d 917, 920, 922 (1972); Democratic National Committee, supra, at 900-901; Green v. Federal Communications Commission, 144 U.S.App.D.C. 353, 447 F.2d 323, 327, 329 (1971); Obligations of Broadcast Licensees, supra, at 28; Loevinger, "Free Speech, Fairness and Fiduciary Duty in Broadcasting," 34 Law and Contemp.Prob. 278, 285 (1969). Therefore, in order for petitioners to establish the right to a reply under either the general fairness doctrine or the particular personal attack rule, they must show that views on a controversial issue of public importance were set forth in the assailed broadcast.
 
 
 15
 This Court cannot make a de novo determination whether one side of a controversial issue of public importance was presented by the skit on the August 10th Dick Cavett Show. The licensee, in applying the fairness doctrine, is required to make reasonable judgments in good faith on the facts before it. Thus while petitioners are of course correct about the poor taste of the jokes in question, under the fairness doctrine and the personal attack rule, the Commission's order must be upheld if the Commission properly determined that ABC's conclusion that the broadcast did not involve a controversial issue of public importance was not unreasonable nor in bad faith. See Columbia Broadcasting Systems, supra, 412 U.S. at 118-119, 124, 127, 131, 93 S.Ct. 2080; Democratic National Committee, supra, at 900-903; Larus & Brother Co. v. Federal Communications Commission, 447 F.2d 876, 879 (4th Cir. 1971); Green v. Federal Communications Commission, supra, at 329-330; Neckritz v. Federal Communications Commission, 446 F.2d 501, 502 (9th Cir. 1971); In Re Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 40 F.C.C. 598, 599 (1964).
 
 
 16
 Had petitioners successfully established before the Commission that the challenged segment of the broadcast constituted the presentation of views on a controversial issue of public importance, they would then be required to demonstrate that ABC's overall approach to the subject was unbalanced. See, e. g., Democratic National Committee, supra, at 902-903. Since the Commission upheld ABC's determination that no statement on a controversial issue of public importance occurred, our inquiry is limited to whether petitioners have made the necessary threshold showing that ABC's determination that the August 10th program did not involve a discussion of a controversial issue of public importance was either unreasonable or in bad faith. We hold they have not.[5]
 
 
 17
 The Commission's Determination that ABC Acted Reasonably and in Good Faith
 
 
 18
 In the present case, ABC decided that the Polish joke material contained in the August 10th Dick Cavett Show did not present a controversial issue of public importance. Thus in its opposition to the application for review before the full Commission, ABC formally contended that the comedy skit on the August 10th show did not represent a controversial issue of public importance. The Commission concluded that ABC acted reasonably and in good faith in making this determination because petitioners had not shown there was any controversy in this country concerning the intelligence or other qualities of Polish Americans. Even petitioners recognize "that broadcasters have discretion in deciding whether a controversial issue of public importance exists and their latitude may be wide" (Reply Br. at 6). Neither the Commission nor we should encroach upon this determination by ABC in the absence of an abuse of its discretion. Democratic National Committee, supra, at 906.
 
 
 19
 Petitioners do not assert that ABC lacked good faith. Thus the thrust of their argument is that the network's determination that there was no discussion of a controversial issue of public importance in the August 10th Polish joke skit was unreasonable.
 
 
 20
 In order to invoke the fairness doctrine, a petitioner must first define the issue which it maintains is a controversial one of public importance. Green v. Federal Communications Commission, supra, at 329. In the complaint and application for review before the Commission, in the briefs here, and at oral argument we searched in vain for petitioners' statement of the issue. We have found no clear statement of a question that could serve as an issue around which an important public controversy could form. In petitioners' letter to ABC, they simply requested "equal time" to reply to the August 10th show wherein Steve Allen and Bob Einstein allegedly "defamed Polish Americans." In the July 2, 1973, complaint to the Commission, the attempts to state the issue were as follows:
 
 
 21
 "Under the Fairness Doctrine, the broadcasting of personal attacks, the depiction of Polish persons or culture in a demeaning manner, the broadcasting of ethnic 'humor' that is insulting to the intelligence, character, hygiene, or appearance of these persons is a controversial issue of public importance because such programming represents a single warped and negative point of view which has an enormous influence on the viewing audience. The televising of so-called 'Polack jokes' is per se a controversial issue of public importance, harmful and insulting to a considerable segment of the American population.
 
 
 22
 "The Federal Communications Commission is therefore requested to rule that the 'Polack jokes' on the Dick Cavett Show, hosted by Steve Allen, on August 10 and 11, 1972 constitute a controversial issue of public importance because such jokes in and of themselves belittle a large segment of the population, both young and adult."
 
 
 23
 After the Bureau's ruling that there was no discussion of a controversial issue of public importance on the August 10th show, the application for review before the full Commission was filed, containing these statements about the issue:
 
 
 24
 "The Staff action supported the view of the licensee that promulgating such humor (Polish jokes) is not a controversial issue of public importance, and that complainants did not present evidence that the issue is such a controversy of public importance.
 
 
 25
 "The group attacked is large, in excess of ten million Polish Americans. The issue is one of public importance as a result of mere numbers alone. It is controversial because the unanswered 'Polack joke' does, tends to, or is likely to belittle the Polish American in our society."
 
 
 26
 Reading the pleadings before the Commission leniently, two possible issues are suggested by these excerpts: (1) whether Poles or Polish Americans are inferior to other human beings in terms of intelligence, personal hygiene, etc.; or (2) whether "promulgating" Polish jokes by broadcasting them (if promulgation can be inferred from mere broadcasting) is desirable. Nowhere in the complaint or application for review before the Commission is there a clear statement of the issue which is alleged to be both controversial and of public importance. It would be improper to require the licensee and the Commission to ferret out the critical issue, since petitioners bear the burden of putting the issue forward in a manner that makes it possible for the exercise of discretion as to whether the fairness doctrine or personal attack rule has been properly invoked. Nevertheless, we need not rely on petitioners' failure to state the issue clearly, because the Commission was correct in ruling that ABC did not overstep its discretion in failing to find a controversial issue of public importance, even if we regard the above two issues as properly suggested in the complaint and application for review.
 
 
 27
 Petitioners allege nothing that would support a contention that there is a controversy over the issue whether Poles or Polish Americans are less intelligent, less clean, less coordinated, etc. than other people. If some people do seriously assert the inferiority of Poles and Polish Americans, it was not unreasonable for ABC to decide that they have not generated enough support for their position to raise a controversial issue of public importance. Even if such a debate existed, we could not say that a determination by ABC that the broadcast of the skit in question did not constitute a discussion of this issue was unreasonable. In any event, the record satisfies us that petitioners did not seek to convince the Commission that the skit presented views on such a question.
 
 
 28
 Assuming that petitioners asserted the question whether broadcasting Polish jokes is desirable, they still failed to demonstrate that there is a controversy of public importance over that issue. In an attempt to show that a controversial issue of public importance was aired on August 10th, petitioners cite the news coverage afforded the filing of the complaint in this case. Many newspapers across the country carried a wire service story describing the action filed with the Commission. All newsworthy events do not constitute controversial issues of public importance. Healey v. Federal Communications Commission, supra, at 922. Moreover, the newsworthy event covered by the papers was not the Polish joke skit, but a filing of a complaint by petitioners before the Commission. The complaint was filed almost eleven months after the broadcast. To the extent that news stories might reflect on the existence of a controversial issue of public importance, the "fairness doctrine requires a current judgment," so that the passage of the eleven months from the broadcast might well have caused the Commission to discount the relevance of the news stories. Larus & Brother Co., supra, at 881, 883.
 
 
 29
 In assailing the licensee's decision, petitioners also rely on the denunciation of Polish jokes by various individuals and groups, including resolutions by the city government of Hartford, Connecticut, and the United States House of Representatives. Such condemnations do not cause a skit containing Polish jokes to become a discussion of a controversial issue of public importance. No contrary resolutions or other disagreements with the essence of the resolutions are cited from which the Commission or ABC might deduce that a controversy existed over the desirability of broadcasting Polish jokes. Even if we assume that the skit constituted a statement favoring the broadcasting of Polish jokes, it was reasonable to conclude that such an endorsement does not create a public issue requiring a response, where nothing suggests that such an issue existed before the broadcast.
 
 
 30
 Petitioners cite an informal survey of children in the sixth grade responding to the question "What does Poland or Polish mean to me?" Although some of the responses reflect a negative view of Poles, they say nothing about a public controversy over the desirability of broadcasting Polish jokes. Assuming that the survey demonstrates that Polish jokes may have an unhealthy influence on the attitudes of the young toward Polish people, the survey fails to suggest in any way that a public controversy existed at the time of the broadcast over any issue which may reasonably be said to be raised by the pleadings before the Commission.
 
 
 31
 Finally, we reject petitioners' contention that ABC's action in requiring Steve Allen, on the August 11th show, to apologize to those who were offended by the previous night's skit demonstrates that there was a controversial issue of public importance discussed. Television networks are rightfully concerned about the ethnic sensibilities of their audiences. Good public relations in issuing an apology to those who took offense at a segment of a broadcast is not the same as acknowledging that a controversial public issue was discussed. Concern for ethnic sensibilities on the part of the networks is laudable, but the Commission has not been empowered to turn ethnic sensibilities into law.[6]
 
 
 32
 It should also be noted that Steve Allen made it clear on both the August 10th and 11th broadcasts that the skit was intended to amuse. ABC has also so stated. While petitioners do not approve of such attempts at humor, they do not contend that the skit was intended as other than comedy. Certainly, humorous intent should not be an absolute insulator from the fairness doctrine or personal attack rule, for a presentation of views on a controversial issue of public importance might be very effectively couched in a humorous or satirical setting. Nevertheless, the intent of the broadcast may be relevant to the determination whether one side of a controversial issue of public importance has been presented.
 
 
 33
 This Court's conclusion that petitioners have failed to show that the August 10th skit presented a controversial issue of public importance should not be read to preclude the future success of a similar petition. The licensee and the Commission must make the determination whether such a controversy exists with reference to the time of the broadcast. Larus & Brother Co., supra, at 881, 883. Thus it is conceivable that an important public controversy could arise over the desirability of broadcasting Polish jokes at some time after the telecast relevant to this suit. Of course, if a telecast that is challenged in the future consists of the mere recitation of Polish jokes, rather than a serious discussion of an issue, petitioners would be required to prove that merely relating such jokes constituted a presentation of views on, or a discussion of, a controversial issue of public importance.
 
 
 34
 Since we cannot agree with petitioners that the broadcast of these jokes constituted a presentation of views on a controversial issue of public importance, the Commission's order is affirmed.[7]
 
 
 
 [1]
 Subsequently, "Billy," a member of the ABC orchestra, and Allen retold Einstein's fourth joke by making it applicable to Germans and Poles. After the ensuing laughter, Einstein left the stage and Allen "fired" Billy
 
 
 [2]
 Section 326 of the Federal Communications Act provides:
 "Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication."
 
 
 [3]
 Section 315(a) of the Act provides in part:
 "Nothing in the foregoing sentence (dealing with equal opportunity for appearances by legally qualified candidates for public office on broadcasting stations) shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance" (47 U.S.C. § 315(a)). See Red Lion Broadcasting Co. v. Federal Communications Commission, 395 U.S. 367, 380-383, 89 S.Ct. 1794, 23 L.Ed.2d 371.
 
 
 [4]
 The personal attack facet of the fairness doctrine was incorporated into a rule in 1967 and provides in pertinent part:
 "(a) When, during the presentation of views on a controversial issue of public importance, an attack is made upon the honesty, character, integrity or like personal qualities of an identified person or group, the licensee shall, within a reasonable time and in no event later than one week after the attack, transmit to the person or group attacked (1) notification of the date, time and identification of the broadcast; (2) a script or tape (or an accurate summary if a script or tape is not available) of the attack; and (3) an offer of a reasonable opportunity to respond over the licensee's facilities." 47 C.F.R. § 73.679 (1974). See 47 C.F.R. §§ 73.123, 73.300 and 73.598 (all identical to § 73.679).
 The obligations upon the broadcaster under the personal attack rule differ from those imposed by the general fairness doctrine in that under the former "the broadcaster does not have the option of presenting the attacked party's side himself or choosing a third party to present that side." Red Lion, supra, at 378, 89 S.Ct. at 1800. The attacked party himself must be given an opportunity to respond. See Democratic National Committee, supra, at 902.
 
 
 [5]
 Because of this holding, we need not review the Commission's alternate ruling under the personal attack rule that the jokes did not constitute an attack "upon the honesty, character, integrity or like personal qualities of an identified person or group" within the meaning of that rule
 
 
 [6]
 See Wall Street Journal editorial, "Polish Jokes," of July 27, 1973
 
 
 [7]
 National Broadcasting Co. v. Federal Communications Commission, 516 F.2d 1101 (D.C.Cir.1974), involves the fairness doctrine in a situation where the Commission rejected the licensee's determination that an opportunity to reply was not required. A majority of the panel thought the Commission erred and reversed. Rehearing en banc was first granted (December 13, 1974) and then the Court en banc remanded the case to the original panel, reinstating their opinion, for consideration of mootness (March 18, 1975). Judge Bazelon filed a lengthy dissent from the en banc order remanding the case. In an order released July 11, 1975, the panel on remand vacated their original judgment reversing the Commission and remanded the case to it for dismissal of the fairness complaint. The Commission had requested this action after determining that the passage by Congress of certain legislation had removed the need for a response to the challenged broadcast. Much of the disagreement among the judges of the District of Columbia Circuit in National Broadcasting Co. stemmed from the Commission's reversal of the licensee's decision. Such a reversal did not occur in the instant case. Thus, while we have examined the opinions of the various judges, it has not been necessary for us to refer to them in disposing of this case